71 A.3d 105

EXXON MOBIL CORPORATION

v.

Paul D. FORD, et al.

No. 16, Sept. Term, 2012.

Court of Appeals of Maryland.

Feb. 26, 2013.

430

Ava E. Lias–Booker (McGuire Woods LLP, Baltimore, MD), on brief, for petitioner/cross-respondent.

Charles P. Scheeler (John E. Griffith, Jr. and Jeffrey D. Herschman of DLA Piper LLP (US), Baltimore, MD; James F. Sanders and Thomas H. Dundon of Neal & Harwell, PLC, Nashville, TN), on brief, for petitioner/cross-respondent.

Stephen L. Snyder (Michael B. Snyder of Snyder & Snyder, Baltimore, MD; Robert J. Weltchek and Kristopher A. Mallahan of Weltchek, Mallahan & Weltchek, LLC, Lutherville, MD), on brief, for respondents/cross-petitioners.

David Super, Steven Leifer, Baker Botts L.L.P., Washington, DC, Samara L. Kline, Baker Botts L.L.P., Dallas, TX, Robin S. Conrad, Rachel Brand, National Chamber Litigation Center, Inc., Washington, DC., on brief, for amici curiae Chamber of Commerce of the United States of America and Maryland Chamber of Commerce.

Douglas F. Gansler, Atty. Gen. of Maryland, William F. Brockman, Deputy Sol. Gen., Julia Doyle Bernhardt, Asst. Atty. Gen., Baltimore, MD, on brief, for amicus curiae Attorney General of Maryland.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA, McDONALD, and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

HARRELL, J.

## FACTUAL BACKGROUND

This is a companion case [1] brought by residents of Jacksonville, Maryland,[2] against Exxon Mobil Corporation (Petition-

---

1. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 71 A.3d 30 (2013) is the other case, and arises from the same general factual background as the present case. The opinion in *Albright* was filed immediately prior to this opinion.

2. The impacted Jacksonville residents in the present case, as explained further in this opinion, filed here as Respondents, Petitioners, Cross–Respondents, and Cross–Petitioners. For the sake of simplicity, we shall refer to them as Respondents, collectively. The following are the individuals and families (constituting eighty-seven households) Exxon named as Respondents in its Petition for Writ of Certiorari, which initiated the case in this Court: Thomas and Christine Acchione; Jeff and Marsha Alban; David and Joyce Albert; Thomas Anderson and Stacey Curtiss; Robert Babcock and family; George Badders and Mindy Shoemaker; Mirza Baig and Amtul Baig and family; Robert Denney Barnett and Louis Lindsey; Joseph and Palma Barone; Joseph and Sharon Bateman; Scott and Andrea Batton; Thomas and Lisa

er)[3] for an underground gasoline leak from an Exxon Mobil-owned gasoline service station, located at the corner of Jarrettsville Pike and Paper Mill Road in the Jacksonville area of

Benney and family; Dennis and Lisa Berlin; William Bieber; Martin and Joyce Blair and family; Martin and Cassandra Brady and family; Robert and Margaret Butler; David and Jennifer Cadigan; Thomas and Karen Carroll; John and Gina Coffay and family; Bartlett and Patricia Colgan and family; Carol Copeland and Martin McHugh, III; Brian Cormier and Karen Healey; Michael and Susan Cremen and family; John and Martha Csicsek; Michael and Bobbie Davis and family; Thomas and Liza Debolt; Mae DeDeo; Lisa De Koomen; Ricci and Sally Depasquale and family; Ronald and Joan Diedeman; Dennis and Priscilla Digalbo and family; Jai Dixon and Janet Elkington; Hilton Ryan and Amy Dobb and family; Barry and Susan Faber; Thomas and LaGina Facinoli; Gary and Tracey Flora and family; Paul and Judith Ford; Matthew Fox and Michele Shindledecker; David and Stacy Fritz and family; Frank and Kathleen Fulco, Alexandra Hogan, Rachel Hogan, and Devin Hogan; Claude and Janet Gollihue; Allan and Barbara Gottschalck and family; Andrea Greco and Veronica Greco and family; Martin Greenblatt and Elizabeth Robertson, Lindsey Kiefer and Alex Kiefer; David and Lisa Gregory and family; Mildred Hahn; Joseph Tamberino, Eliza Tamberino, and Austin Tamberino, Herman and Laverne Hannan; Walter and Carolyn Heggie and family; James and Janet Hourihan and family; Thomas and Jodi Howe and family; Jeffrey Jenkins and Nicole Ripken and family; Bernard and Christine Kropfelder and family; Glen and Hope Kukucka and family; Mark and Mary Lamos and family; John and Yvonne Lanting; Elaine Lindsay and Tresia Parks; David and Rosemarie Mahoney and family; Terry and Janice Martin and family; Edward and Barbara McLewee and family; Walter Merski; Anthony and Valerie Montone and family; Frank Mucha, III and Jennifer Mucha and family; Leon Nickel, Jr. and Teresa Nickel and family; Michael and Linda Oberlin and family; Michael and Gail Osmeyer and family; Joyce Pertee and family; Robert Peters and family; C. Boyd and Brenda Pfeiffer and family; John and Jennifer Quinn and family; Gary and Kim Rosch; Leslie Rush and Joyce Rush; Michael Schech and family; Christopher Schultz and Margaret McDevitt; Jeffrey and Amy Shimp and family; Nancy Simms and family; John and Patricia Sipes; Mary Thompson; Kenneth Thompson and Maria Chavez and family; Anthony and Lilian Tirocchi; Steven and Tracey Tizard and family; Roger Tolle, Jr., and family; Robert and Shawnee Twardzik and family; Kurt and Cynthia Vacovsky and family; Michael and Lori Vogler and family; Christopher Wiedey and Christine Wilkinson, and Stephen Stelmack; and Franz and Dolores Wittelsberger and family.

3. As explained later, Exxon Mobil (referred to also as Exxon in this opinion) is a Petitioner, Cross–Respondent, and Cross–Petitioner. For purposes of simplicity, we refer to Exxon as Petitioner in this opinion.

Baltimore County, that began on 13 January 2006.[4] The leak detection system at the station failed to detect a punctured underground line leak, which caused a gasoline leak of approximately 26,000 gallons into the underground aquifer and resulted in the contamination of wells supplying water to a number of households over a period of more than thirty days.

On the record of this case, there is a dispute as to when the residents of the impacted Jacksonville neighborhood learned of the leak. While Exxon contends that it notified Herbert Meade, administrator for the oil control program in the Maryland Department of the Environment (MDE), of the spill on February 17, and that Meade contacted immediately the president of the local community association, Respondents maintain that they learned of the leak only after local media reported the story four days later.

Following notification of the leak, the MDE, pursuant to its statutory authority, ordered Exxon to submit an Interim Remedial Measure Plan. *See* Md.Code (1982, 2007), Environment Art., §§ 4-401–4-419. As part of its immediate remediation efforts, Exxon drilled wells for monitoring and recovery surrounding the proximate vicinity of the Exxon station. The monitoring wells were dug at various depths in order to conduct water samples indicating the presence and extent of the contamination, also known as the "strike line." The

---

**4.** The history of this gasoline leak is explained in detail in *Albright.* 433 Md. at 316–27, 71 A.3d at 37–45. To summarize, a leak from underground service lines at the Exxon Mobil-owned gasoline service station occurred on 13 January 2006. A contractor who responded to an electronic alarm surmised incorrectly that a pump motor triggered the alarm, replaced the pump motor, and caused incidentally the leak detection system to require recalibration. Because the system was recalibrated improperly, it failed to detect the continuing leak when placed back in service. On 16 February 2006, the service station operator reported a possible leak based an inventory discrepancy. The service station was shut down thereafter. On February 17, Exxon confirmed the existence of the leak, which amounted to approximately 26,000 gallons of gasoline, and notified the Maryland Department of the Environment (MDE). In conjunction with and under the supervision of the MDE, Exxon initiated remediation efforts, including constructing monitoring and/or recovery wells used to monitor and recover contaminants. These remediation efforts are described in *Albright.*

purpose of the recovery wells was to treat groundwater to prevent further expansion of the strike line. There were 227 monitoring wells installed by October 2007, and the MDE ordered an additional thirty wells in order to conduct long-term monitoring. Since February 2006, water samples have been taken from the monitoring wells and residential potable wells.

Respondents filed suit in the Circuit Court for Baltimore County against Exxon. Their claims alleged that their properties had decreased in value, and that their health was threatened as a result of exposure to toxic chemicals—specifically, methyl tertiary-butyl ether ("MTBE"), a possible carcinogen, and benzene, a known carcinogen [5]—in the gasoline leak. The Respondents' alleged exposure arose from their use of water from the potable wells on their properties. The properties owned by Respondents were located at varying distances from the source of the leak. The overview of Respondents' claims and summary of the evidence at trial are discussed below.

---

**5.** MTBE is a toxic substance found in gasoline. Since 1979, MTBE has been added to gasoline to reduce emissions of air pollutants from exhaust systems. There are no human studies indicating the MTBE is a proven carcinogen. The U.S. Environmental Protection Agency ("EPA") has identified MTBE as a possible carcinogen, in large doses, but not at low exposure levels. Based on the absence of proven scientific studies showing that MTBE is a human carcinogen, the EPA has not set a maximum contaminant level ("MCL"), but instead has established a maximum MTBE level at 20–40 parts per billion ("ppb") based on the substance's unpleasant taste and odor at and beyond that level. The EPA has recognized that a range of 20–40 ppb provides "a large margin of exposure (safety) from toxic effects." United States Environmental Protection Agency, Drinking Water Advisory: Consumer Acceptability Advice and Health Effects Analysis on Methyl Tertiary–Butyl Ether (MTBE) 2 (1997). The MDE has adopted likewise an MCL of 20 ppb for MTBE based on the chemical's unpleasant odor and taste at and beyond that level, but has noted that any contamination above the 20 ppb level is a matter of "concern." *See* COMAR 26.10.02.03(B)(3)(e). MCL standards for MTBE are different across the states, with some lower and some higher than those adopted by the EPA and MDE.

Benzene is a toxic chemical classified as a carcinogen. It has an MCL of 5 ppb, as established by the EPA. The MDE has promulgated the same standard for benzene. *See* COMAR 26.04.01.07(D).

## PROCEDURAL BACKGROUND

### I.  Respondents' Claims

A single complaint was filed on 17 October 2006.  Respondents, composed of eighty-four households,[6] sought compensatory and punitive damages based on allegations of fraudulent concealment,[7] intentional infliction of emotional distress, strict liability, trespass, private nuisance, and negligence.[8]  They sought punitive damages and three types of compensatory damages:  (1) monetary damages for diminution in the fair market value of their real property;  (2) non-economic damages for emotional distress, including fear of contracting cancer;  and (3) damages for the costs of future medical monitoring.

The claims of intentional infliction of emotional distress were dismissed subsequently by all Respondents, but the trespass counts were dismissed by only some Respondents.  Petitioner admitted liability for trespass, private nuisance, negligence, and strict liability, but denied liability for fraud and punitive damages.  Petitioner further maintained that

---

**6.**  The residents of Jacksonville who were plaintiffs in the underlying case comprised eighty-eight households.  The plaintiffs who are Respondents in the present appeal, however, comprise only eighty-four of those households, as some of the original plaintiffs settled or dismissed their claims at various stages of this lengthy litigation.

**7.**  The fraud claim was based on allegations that (1) the line leak detection system at the station was antiquated and unreliable, that Petitioner had concerns about the system, and that Petitioner failed to disclose those facts to the Jacksonville residents;  and (2) Petitioner failed to notify immediately the residents when the leak was discovered and thereafter failed to keep them informed fully.  We will not address further these claims because they are not before us on appeal.

**8.**  The Respondents in the present case are those individuals who had emotional distress claims remanded for a new trial, or whose damage claims for the full pre-leak value of their properties were affirmed, by the Court of Special Appeals.  *Exxon Mobil Corp. v. Ford,* 204 Md.App. 1, 11, 40 A.3d 514, 520 (2012).  Certain individuals, who were plaintiffs in the underlying case, but not Respondents currently, however, are Cross–Petitioners and Cross–Respondents in the present case.  The Libertini family is not before this Court in any capacity because their claims were settled after suit was filed.

certain of the compensatory damages claimed—non-economic emotional distress damages arising from injury to property and fear of cancer, and damages for medical monitoring costs—were not compensable under Maryland law.

The cases were consolidated by the Circuit Court for trial. On 14 October 2008, a jury trial began, presided over by the Honorable Maurice W. Baldwin, Jr., and lasted until 12 March 2009. Liability was not contested by Exxon, so the trial focused on whether any Respondents suffered compensable injuries as a proximate result of the leak and, if so, what compensatory damages should be awarded. The jury was asked also whether Exxon was liable for fraud warranting the award of punitive damages.[9]

## II.  Contamination of Wells on Respondents' Properties

Of the eighty-seven properties implicated in this case, water testing of the residential potable wells in 2006 indicated MTBE concentrations above the MDE action level of 20 ppb in only two.[10] Exxon paid for the installation of point of entry treatment ("POET") systems to filter well water entering those homes. Measurable amounts of MTBE below 20 ppb were found in samples from potable wells on sixty-three of the plaintiffs' properties in 2006. By the time of trial, however, the most recent samples revealed no potable wells with MTBE concentrations exceeding 20 ppb.[11] Although five potable wells tested for detectable amounts of benzene,[12] none of the

---

9. Respondents called several witnesses with regard to the fraud claim, arguing that Petitioner concealed information before and after the leak. We will not further address this evidence, however, because it is not necessary to do so in order to determine the issues raised in the instant appeal.

10. These were wells on the Anderson and Fox properties, which indicated MTBE concentrations of 20.4 ppb and 47.7 ppb, respectively.

11. Current (as of the trial) MTBE test results were not available for eleven wells.

12. Specifically, these wells were owned by the following households and indicated the following levels of benzene contamination: Dobb

potable well samples tested for benzene at an amount exceeding the MDE's 5 ppb action level.

Monitoring wells installed on all properties were used also to measure the extent of MTBE and benzene contamination. Monitoring wells were dug on at least thirteen of Respondents' properties, ranging from one to a maximum of nineteen monitoring wells on each property. The samples from the monitoring wells showed MTBE concentrations exceeding the action level on five properties.[13] Benzene levels exceeding the 5 ppb action level were found in samples from monitoring wells on four properties.[14]

### III. Lay Testimony

Respondents' testimony involved: the nature, extent, and impact of remediation activities on a particular property; the extent to which residents' outdoors and/or indoors activities were limited by the effects of the leak; the nature and extent of MTBE and/or benzene contamination on a property, as reflected by well test readings; whether harmful chemicals not attributable to gasoline were found in wells; the location of each property in relation to the strike line; the nature and extent of use of well water; the impact of the leak consequences on the value of each property;[15] employment and other financial concerns of Respondents; matters related to emotional distress; and Respondents' perceived need for future medical monitoring.

---

(0.42 ppb); Fritz (0.096 ppb); Rush (0.10 ppb); Vacovsky (0.13 ppb); and Wiedey (0.10 ppb).

13. These were: the Baig property (317,000 ppb); the Brady property (754 ppb); the Dobb property (60.7 ppb); and the McLewee property (37, 200 ppb).

14. These were: the Baig property (18,500 ppb); the Brady property (7.9 ppb); the McLewee property (324 ppb); and the Tizard property (11.8 ppb).

15. Respondents' testimony regarding property damage is amplified in Section V of this opinion.

## IV. Expert Testimony

Much of the expert testimony at trial turned on whether a property had been contaminated by MTBE or benzene as a result of the leak, based on a property's location in relation to the strike line and the extent of contamination, if any.

### A. For Respondents

Respondents' attorney arranged for any Respondent, who wished to, to see Abdul Malik, M.D., a psychiatrist. Eighty-seven individual plaintiffs accepted the offer. Thirteen sought follow-up treatment in Dr. Malik's office. Dr. Malik, and his colleagues, interviewed these Respondents individually for about forty-five minutes to an hour each. The parties stipulated at the beginning of trial that if a witness from Dr. Malik's organization, Psych Associates of Maryland, were called to testify, the witness would testify that each of these Respondents was diagnosed with a disorder that was caused by, or exacerbated by, the leak. The stipulation included a recitation that Petitioner disagreed with the proffered testimony and asserted that none of the Respondents suffered permanent psychological injuries or longterm emotional distress.

Eight of the Respondents covered by the stipulation had pre-existing psychological conditions that, at some point, required psychotherapy, counseling, or medication. Of those other Respondents covered by the stipulation, Dr. Malik did not recommend therapy or counseling for thirty-six of them, recommended treatment for twenty-one Respondents with no prior history of treatment for emotional distress, and advised four Respondents with preexisting conditions to continue therapy.

A second stipulation was entered by the parties as to the testimony of Nachman Brautbar, M.D., where they agreed that, if Dr. Brautbar were called to testify, he would state that all Respondents required medical monitoring.[16] Dr. Brautbar

---

16. The stipulation provided that Dr. Brautbar would testify: "[b]ased on the opinions of Kenneth Rudo and my understanding of the nature

recommended annual tests for testicular cancer, kidney cancer, liver cancer, and hematolymphatic cancers, with estimated total costs per Respondent of $2,000 per year.

Another expert for Respondents was Harvey Cohen, a geologist with a specialty in hydrogeology, who testified about the movement of ground water generally, the function of potable wells, his mapping of the well test results, and his opinion about future contamination of the aquifer. His opinion was that, from the time of commencement of the leak through April 2007, sixty-six properties had detectable levels of MTBE, and five had a detectable amount of benzene. He also described the levels of contaminants found in monitoring wells over the same time period. His testimony was based on exhibits displaying the maximum concentrations, without indicating the point in time at which those levels were recorded. He further opined that the area of contamination would be ever-changing because of the movement of ground water.

Edward Sullivan, a geologist with a specialty in hydrogeology, employed by the Whitman Companies, also testified as an expert for Respondents. He described underground fractures, aquifers, and the movement of ground water generally. Sullivan opined that the detected levels of contamination were caused probably by the gasoline leak, that the Baigs' potable well likely would be contaminated in the future, and that the gasoline forced down in the deeper bedrock would likely not be recovered by remediation, and that it would be difficult to determine its movement.

Dr. Kenneth Rudo, a toxicologist employed by the State of North Carolina, also testified as an expert witness for Respondents. He stated that there is a relatively sparse body of knowledge relating to MTBE because it has been used in gasoline for only about twenty to thirty years. He opined that MTBE is a probable human carcinogen and a probable human mutagen, and that MTBE exposure can occur through in-

and extent of Plaintiffs' exposure to MTBE, I believe the following tests for examinations should be performed as part of an annual medical monitoring protocol." The tests are described above.

gestion, bathing or other skin contact, or breathing vapor containing MTBE. He stated that exposure produces an increased risk of cancer. Dr. Rudo testified that he could not state that any of the Respondents would, more likely than not, contract cancer as a result of the leak, but that there is "no safe level" of exposure to MTBE.[17]

Kenneth Acks testified as an expert in real estate appraisal and "environmental economics." Relying on a stipulation by the parties as to the pre-leak value of each property and on information provided by the other experts, Acks' testimony discussed the diminished value of each property. We discuss

---

**17.** On direct examination of Dr. Rudo, the following testimony was adduced regarding thirty-nine plaintiffs who were exposed allegedly to the leak's contamination in their potable wells, prior to being notified of the leak:

RESPONDENTS' COUNSEL: ....you would agree that the exposures to the various plaintiffs vary from plaintiff to plaintiff?

DR. RUDO: Yes.

COUNSEL. And the amount of contamination in their wells varies not only from plaintiff to plaintiff but from test to test?

DR. RUDO: Yes, sir.

COUNSEL: Now, with that in mind, can you state to a reasonable degree of probability in your field as a toxicologist that each of the plaintiffs that I have just described is in fact at an increased risk for developing these cancers in the future?

DR. RUDO: Yes, they are.

COUNSEL: And what is it about the exposure of any kind? Because they do vary from levels that are below one part per billion to levels that I think the highest level, 47.7 parts per billion, explain to the jury the-how you parse through the levels of exposure, the levels of contamination that they were exposed to and how you were able to conclude that even at these low levels in some of the plaintiffs' wells they were exposed to a level that will likely put them at increased risks for cancers in the future?

DR. RUDO: Well, Number one, they were most certainly exposed. They had the positive [well] tests, you know, had exposure to a chemical that we consider more likely than not to be carcinogenic. Because we also consider it to be more likely than not a mutagenic chemical that can change DNA, that that implies that in essence *there is no safe level; there is no safe level in terms of exposure time and there is no safe level in terms of the amount of chemical that is there. So in essence, the safe level would be considered zero. Anything over and above that would increase the risk.*

(Emphasis added). Apart from this testimony, Dr. Rudo did not testify as to any other Respondent's increased risk to contracting cancer.

Acks' testimony in greater detail in Section V.A. of this opinion.

Dr. Ira Whitman, Ph.D, a civil engineer, and Dr. Jerold Jaynes, Ph.D, an economist, were the last two experts who testified for Respondents. Dr. Whitman testified as an expert in environmental engineering and worked with the geologists, Cohen and Sullivan, to explain that thirty-eight or thirty-nine potable wells were likely contaminated between 13 January 2006 and 17 February 2006. He noted that, as of the date of his 2006 report, fifty homes showed some contamination at some point in time, and that number later rose to sixty-six homes.[18] Dr. Jaynes testified about the present value of the cost of future medical monitoring for Respondents.[19]

### B. For Petitioner

Petitioner's expert, Dr. Gary Krieger, M.D., testified that all people in this country are exposed to carcinogens and mutagens, including MTBE and benzene, every day, including in food and water that is consumed. He emphasized that the dose is the real issue—essentially, that mere exposure does not cause cancer. He further stated that the risk of disease Respondents faced was no different than the risk of disease for the general population.

Ronald Lipman, a real estate appraiser, testified that, in 2007 and 2008, there was a general downturn in the real estate market nationally, and that the effect of the gasoline leak on property values in Jacksonville ranged from 0% to 15 %, depending on the property.

---

18. Dr. Whitman's company performed air sampling in four homes, but did not further pursue air sampling. He did not do a time series mapping of the effect of remediation activities. He acknowledged that gasoline attenuates naturally, but stated that not all of it does. He did not conduct an attenuation study in these cases.

19. Dr. Jaynes multiplied the remaining years of life expectancy for each Respondent by $2,000 per year, and increased the cost per year assuming an inflation rate of 3.74 %. He then reduced the total to present value, assuming an interest rate of 5.2%.

Another expert for Petitioner was Gregory Martin, who described the remediation efforts conducted pursuant to a consent order entered into between the MDE and Petitioner. In compliance with the order, Petitioner filed a corrective action plan and intends to continue efforts until the remediation goals are met.

Herbert Meade, administrator for the oil control program in the MDE, testified regarding the Maryland action level for MTBE. He asserted that the MDE action level is protective of human health. Significantly, he noted that MTBE is the most frequently found ground water contaminant in Maryland. With respect to the properties in this case, he stated that some needed filter systems and others should have them as a precautionary matter, but that the potable well water is safe to drink. Meade also acknowledged that, because of the lack of human studies, he did not know the long term effects of exposure to MTBE.

Thomas Maguire, another expert testifying for Petitioner, discussed the nature of an underground fuel leak and how gasoline and its contaminants are dispersed, removed, or attenuated naturally. He opined that the underground plume for this leak had stabilized, meaning the residual contaminants were trapped and immobile.[20] He acknowledged there likely was still some residual contamination which, in the future, would be removed as part of the remediation efforts, or would be attenuated naturally.

## V. The Jury's Verdicts

Before the trial court gave the jury instructions on causation and damages, the court advised the jury that the instructions applied to each plaintiff, unless otherwise indicated.[21] The instructions were all phrased in terms of what each

---

**20.** Maguire based his opinion on the life cycle of a plume, which initially expands and later reaches equilibrium. The latter occurs when the rate at which the contaminants are dissolving equals the rate of attenuation.

**21.** No exceptions were taken to that instruction.

plaintiff had to prove to be entitled to recover. In particular, the jury instruction as to recovery for emotional distress damages based on fear of contracting cancer was as follows:

A Plaintiff may also recover non-economic damages for fear of contracting a particular disease such as cancer. To recover for such fear, however, the Plaintiff must demonstrate that the fear genuinely exists and that his or her fear of contracting the disease in question is objectively reasonable. There can be no compensation for fear and anxiety that is objectively unreasonable. To be objectively reasonable, it is not enough that a ... Plaintiff's fear be genuine and sincere. There must be reliable medical or scientific evidence that it is more likely than not that the substance can cause cancer.

The same format for the jury's awards appeared in the verdict sheets for each plaintiff: each asked essentially "(A) do you find ... fraud by concealment? (B) do you find that [Petitioner's admitted liability for negligence, strict liability, nuisance, and trespass] caused [the plaintiffs] any injuries and damages? and (C) if the answer to (A) or (B) is yes, how much [compensatory] damages do you award?" The last question was followed by individual categories of damages to be filled-in if the jury responded "yes":

Economic Damages

Damages to Property Owner [name of property owner]

Diminution in Property Value $

Medical Monitoring

[names of plaintiffs] $

Non–Economic Loss (Emotional Distress)

[names of plaintiffs] $

Punitive Damages

If you answered "yes" to [question (A) ], should the Plaintiffs be awarded punitive damages? [names of plaintiffs] YES NO

On 12 March 2009, the jury returned its verdicts. The jury returned a verdict in favor of Exxon with respect to the

fraudulent concealment and punitive damage claims, but found in favor of all remaining plaintiffs [22] as to all other claims for compensatory damages. The jury found that each of the plaintiffs' properties was worthless, and awarded monetary damages for diminution of real property value in an amount equal to the full value of the properties before the leak. The jury also awarded to all plaintiffs non-economic damages for emotional distress, including fear of contracting cancer and damages for the cost of future medical monitoring. Generally, in households with children, the awards for the adults were reduced by the amount of the awards for the minors. The total amount of damages awarded to Respondents was approximately $147 million.

Petitioner filed six post-judgment motions [23] for judgment notwithstanding the verdict, for a new trial, or for remittitur, challenging the property damage awards, the emotional distress awards, and the damages for medical monitoring, based on various grounds. Although Judge Baldwin denied each motion,[24] he reduced the awards for non-economic damages for

---

**22.** The Roeterings and Williams families dismissed their claims during trial.

**23.** Petitioner filed, specifically: (1) a motion for judgment notwithstanding the verdict (JNOV) regarding the specific claims of nineteen households; (2) a motion for new trial or remittitur regarding property damage awards for those families whose properties did not have contamination at or above the State MCL for MTBE or benzene; (3) a motion for new trial or remittitur on the claims for property damage; (4) a motion for a new trial based principally on admission of prejudicial evidence, namely Dr. Kenneth Rudo's testimony that he believed MTBE to be a human carcinogen; (5) a motion for JNOV or a new trial on the emotional distress claims; and, lastly, (6) a motion for JNOV on the damages for medical monitoring, arguing that such a claim is not compensable in Maryland.

**24.** In refusing to reverse the property value diminution awards, Judge Baldwin wrote:

This writer is very tempted to substitute my view of the evidence for that of the jury and grant post trial relief. I will decline that strong temptation by keeping in mind that the jury's view of the admitted evidence should be respected unless the verdict is against the weight of the evidence, shocks the conscience, is grossly excessive, or is excessive. It is not, but is a *millimeter shy* of those standards.

four plaintiffs because of the applicable statutory cap of $665,000, pursuant to § 11–108 of the Maryland Code (1973, 2006 Repl.Vol.), Court and Judicial Proceedings Article. Respondents filed a motion arguing that Petitioner should be estopped from challenging the jury verdicts because of seemingly concessionary statements made by its counsel during opening and closing arguments; however, the Circuit Court denied the motion.

## VI.   Proceedings in the Court of Special Appeals

On 9 September 2009, Exxon noted an appeal to the Court of Special Appeals. It challenged the sufficiency of the evidence supporting the jury's awards for complete diminution of property value, damages for emotional distress, and damages for future medical monitoring costs. It also challenged the jury instructions regarding the legal standards to be applied by the jury in deciding the claims for damages based on fear of developing cancer and future medical monitoring costs. Respondents contended, in turn, that Exxon's attorney at trial waived Exxon's right to challenge the compensatory damage awards by certain things he said in opening statement and closing argument.

On 6 January 2010, the Court of Special Appeals consolidated the eighty-eight appeals. In January 2011, a three-judge panel of that court (consisting of Judges Meredith, Zarnoch, and retired Judge Thieme, the latter specially assigned) heard argument. The panel did not issue a decision. Thus the court ordered rehearing in banc on 9 June 2011.[25]

On 9 February 2012, the in banc panel, consisting of nine incumbent members of the court, issued a per curiam opinion and a number of attributed opinions on various questions presented by the appeal. *Exxon Mobil Corp. v. Ford*, 204 Md.App. 1, 40 A.3d 514 (2012). The Court of Special Appeals

---

(Emphasis added).

25.   We address further Respondents' argument that the in banc decision was improper in Section I of this opinion.

affirmed in part and reversed in part the judgment of the Circuit Court for Baltimore County, having the effect of reducing the $147 million in damages awarded to the Respondents by more than half.

The intermediate appellate court rejected unanimously the Respondents' contention that Petitioner was estopped from challenging the compensatory damages awards, and concluded unanimously that the Circuit Court had not abused its discretion in admitting Respondents' expert testimony in support of their claims of diminution in property values. *See id.* at 10–11, 40 A.3d at 519 (per curiam).[26]

Different majorities of the sitting court explained, in various written opinions, their support for the remaining portions of the judgment announced by the per curiam opinion. Regarding the claims for diminution in property value, six of the nine judges affirmed the portion of the judgments that awarded damages to each Respondent (whose judgments had not been remitted by the Circuit Court or the Court of Special Appeals based on the post-leak sale of the property for value) in an amount equal to the value of their property prior to the leak. *See id.* at 11, 40 A.3d at 519. The reasoning for this result, however, differed in several respects between the judges' opinions. *See id.* at 34–50, 40 A.3d at 534–43 (Zarnoch, J., joined by Meredith, Woodward, and Wright, JJ.), *id.* at 148–68, 40 A.3d at 600–12; (J. Eyler, J., joined by Watts, J.); *id.* at 241–44, 40 A.3d at 655 (Graeff, J.), *id.* at 247–52, 40 A.3d at 658–60 (Watts, J.); *id.* at 269–74, 40 A.3d at 671–74 (D. Eyler, J).

---

26. The intermediate appellate court also agreed unanimously that the damage award for one family (the Grecos) should be struck because the family sold their home for a profit and had withdrawn their claim for diminution in value, but was awarded nonetheless $367,000 in damages. *See id.* at 10, 40 A.3d at 519 (per curiam). Additionally, damages for $50,000 each to Luke DeKoomen and Seth DeKoomen (who are not Respondents in the present case) were reversed as part of a ruling affecting fifty-one other plaintiffs, on the basis that the awards were not supported by sufficient evidence. *See id.* at 11–12, 40 A.3d at 519–20 (per curiam).

The court's decision as to the non-economic damages awards also resulted from different views. Most of the court concluded that a plaintiff may recover damages for emotional distress based on fear of contracting cancer in certain circumstances, and that an error in the jury instructions related to this issue required reversal of all of the judgments for non-economic damages. The judges disagreed, however, about whether the circumstances that would permit recovery had been established and about the legal standard that should apply to such claims. *See id.* at 52–53, 40 A.3d at 541–42 (Zarnoch, J.).[27] Nevertheless, a majority voted to reverse judgment awarding damages for emotional distress for fifty-three plaintiffs based on insufficient evidence, and reversed and remanded the remaining claims for a new trial due to a faulty jury instruction. *See id.* at 11, 40 A.3d at 519 (per curiam); 40 A.3d at 600–12 (J. Eyler, J., joined by Hotten, J.)[28], *id.* at 245, 40 A.3d at 655–56 (Graeff, J.),[29] *id.* at 254, 40 A.3d at 661–62 (Watts, J.);[30] *id.*

---

**27.** Judge Zarnoch adopted the standard of a substantial and medically verifiable possibility of contracting a latent disease as the basis to recover emotional distress damages, and would have affirmed the awards under that standard based on the conclusion that the evidence was sufficient and that the jury instructions communicated fairly the correct legal standard. *See id.* at 51–62, 40 A.3d at 544–50. (Zarnoch, J., joined by Meredith, Woodward, and Wright, JJ.)

**28.** Judge James Eyler adopted a standard of whether a plaintiff is "more likely than not" susceptible to contracting cancer in order to recover damages based on fear of cancer, and concluded that most of the plaintiffs failed to present sufficient evidence of emotional distress, except for thirty-five plaintiffs, whose claims he would have remanded for a new trial. *See id.* at 105–32, 40 A.3d at 575–91 (J. Eyler, J., joined by Hotten, J.); *see also id.* at 168–241, 40 A.3d at 613–654 (appendix surveying evidence as to each plaintiff) (J. Eyler, J.).

**29.** Judge Graeff agreed with Judge Zarnoch's fear of cancer standard, but she found the jury instruction did not convey adequately that standard, and she found that the evidence did not warrant the judgments for four categories of plaintiffs identified by Judge Eyler. *See id.* at 244–47, 40 A.3d at 656–57. As to the remaining plaintiffs, Judge Graeff believed there was sufficient evidence to warrant their judgments. *See id.*

**30.** Judge Watts agreed generally with the standard endorsed by Judge James Eyler, but concluded that one of the several plaintiffs identified

at 259–69, 40 A.3d at 665–71 (D. Eyler, J.).[31]  As a result, the court reversed all emotional distress judgments and ordered a new trial for all but fifty-three of the plaintiffs on those claims, to be conducted consistent with the views of the majority/plurality opinion.  *Id.* at 11–12, 40 A.3d at 520 (per curiam).

Respondents' awards for damages for future medical monitoring costs also produced split majorities of the in banc panel. Although a majority would recognize a claim for monetary damages for medical monitoring, *see id.* at 63–70, 40 A.3d at 550–55 (Zarnoch, J. joined by Meredith, Woodward, and Wright, JJ.), *id.* at 247, 40 A.3d at 658 (Graeff, J.), a differently aligned majority decided that the evidence did not warrant any plaintiff's entitlement to this form of damages. *See id.* at 11, 40 A.3d at 520 (per curiam); *id.* at 132–47, 40 A.3d at 591– 600 (J. Eyler, J.), *id.* at 247, 40 A.3d at 658 (Graeff, J.), *id.* at 255–57, 40 A.3d at 663–64 (Watts, J.).[32]  Hence, the court reversed the portions of the judgments that awarded damages for medical monitoring.

On 27 February 2012, Respondents filed a motion under Maryland Rule 8–605 requesting that the Court of Special Appeals reconsider its February 9 in banc decision because the portions of that decision that were supported by fewer than seven judges "violate the clear mandate" of Section 1– 403(c) of Court and Judicial Proceedings Article ("CJP") authorizing the court to decide an appeal through the in banc mechanism.[33]

---

by him presented sufficient evidence of emotional distress to be granted a new trial. *See id.* at 252–55, 40 A.3d at 660–63.

**31.** Judge Deborah Eyler concluded that none of the plaintiffs could recover damages for fear of cancer because there was no evidence that the plaintiffs sustained a probability of developing cancer and because none proffered evidence of a sufficiently demonstrable physical injury. *Id.* at 259–69, 40 A.3d at 665–71.

**32.** Judge Deborah Eyler did not discuss in her opinion the issue of recovery for future medical monitoring costs.

**33.** In their motion, Respondents asserted that for a decision of a case heard by the court in banc, a concurrence of a majority of the incum-

On 6 March 2012, the Court of Special Appeals denied, in a per curiam opinion, the plaintiffs' motion for reconsideration, concluding that the plaintiffs' reading of § 1–403(c) was "overly technical," "inconsistent with sound rules of statutory construction," and "contrary to well-reasoned authorities." *Ford*, 204 Md.App. 274, 277, 40 A.3d 674, 675 (2012). The court held that "disqualification is tantamount to a vacancy for the limited purpose of determining voting requirements[,]" *id.* at 279 n. 5, 40 A.3d at 677 n. 5, that a 7–2 majority was not required to support the court's ruling in this case, and that each part of the court's per curiam ruling was supported by a majority of the nine judges "qualified to act in this case." *Id.* at 281, 40 A.3d at 678.[34]

## VII.  Questions Presented and Parties' Present Appellate Contentions [35]

On 26 March 2012, Exxon filed a Petition for Writ for Certiorari.[36]  Respondents [37] filed a cross-petition on 27 March

---

bent judges of the entire court is required.  Respondents claimed further that the three judges who had been scheduled originally to participate on the in banc panel (Chief Judge Krauser, and Judges Mattricciani and Kehoe), but who disqualified themselves from hearing the appeal, were nevertheless "incumbent judges" who should be counted in determining whether a majority was reached.  We address this issue in Section I of the Discussion section of this opinion.

34.  On 8 March 2012, Respondents filed a second motion under Rule 8–605, seeking reconsideration of both the February 9 and March 6 decisions of the intermediate appellate court.  Respondents reasserted their argument made in their first motion for reconsideration, and offered a new issue, based in the March 6 opinion, indicating that "[a]ll incumbent members of the Court joined in the decision to order in banc review, including the 9 judges who eventually heard argument and decided the case." *Id.* at 279 n. 7, 40 A.3d at 677 n. 7. Respondents maintained that participation in this decision by the three judges who later recused themselves "tainted the deliberative process" with the result that the entire in banc procedure violated Rules 1.2 and 2.11 of the Maryland Code of Judicial Conduct in Rule 16–814 and CJP § 1–403(c).  The intermediate appellate court denied the motion.

35.  On 9 May 2012, we issued a Writ of Certiorari in *Exxon Mobil Corp. v. Albright*, 426 Md. 427, 44 A.3d 421 (2012), a pending case in the Court of Special Appeals.  The Respondents in the instant case assert that resolution of the issues presented in *Albright* would also resolve the substantive issues in this appeal (in this contention, they are correct),

2012.[38]   A conditional cross-petition by Exxon to Respondents' cross-petition questions was filed next.[39]   This Court granted

and would allow this Court to "withdraw[ ] or declin[e] certiorari" on those issues if the Court determines that the Court of Special Appeals's per curiam opinion was not issued properly.

**36.**   In its petition for Writ of Certiorari, Exxon presented two questions:

1.   Does Maryland permit award for emotional distress due to fear of contracting cancer, and, if so, must the claimant prove that his or her wrongful exposure to a carcinogen makes it more likely than not that he or she will contract cancer?
2.   May a jury's verdict that all of Plaintiffs' properties were worthless be upheld where (a) the properties were all still habitable and many had no contamination;  (b) all experts testified that the properties retained substantial value;  and (c) those properties which were sold all sold for a substantial price?

**37.**   As noted earlier, these Respondents, representing eighty-four households, are not those whose eighty-eight cases were consolidated on appeal and were awarded damages at trial.

**38.**   In their cross-petition for Writ of Certiorari, Respondents posed the following questions:

1.   Did the Court of Special Appeals violate the clear mandate of Md.Code (1973, 2006 Repl.Vol.), Court and Judicial Proceedings Article (CJP), § 1–403(c), when it issued its in banc decision without a "concurrence of a majority of the incumbent judges of the entire Court?"
2.   Did the Court of Special Appeals err in holding that counsel for ExxonMobil did not waive his client's right to challenge the compensatory damage awards, despite implicit acquiescence in the jury's decision?
3.   Did the Court of Special Appeals err in holding that the "fear of cancer" jury instruction was erroneous and prejudicial?
4.   Did the Court of Special Appeals reach a majority vote of the sitting judges, on the issue of medical monitoring and, if they did, was there error in holding that the evidence was insufficient to support an award for medical monitoring?

**39.**   Exxon's conditional cross-petition posed the following questions:

1.   Assuming fear of cancer is compensable, did Plaintiffs provide legally sufficient evidence of their emotional distress claims?
2.   Does Maryland law permit the recovery of damages for medical monitoring and should it do so where (a) as to many Plaintiffs there was no proof of exposure to MTBE or benzene;  (b) no Plaintiff claimed to have any current disease caused by MTBE or benzene; and (c) there was no proof that any Plaintiff has a significantly increased risk of contracting any disease

all of the petitions for certiorari (by whatever title) on 9 May 2012, *Exxon Mobil Corp. v. Ford,* 426 Md. 427, 44 A.3d 421 (2012). The consolidated questions presented by the petitions are as follows, rephrased for purposes of brevity:

(1) Did the Court of Special Appeals violate Md.Code (1973, 2006 Repl.Vol.), Court and Judicial Proceedings Article (CJP), § 1–403(c), by issuing its in banc decision without a "concurrence of a majority of the incumbent judges of the entire Court[,]" for each non-unanimous judgment, such that this Court otherwise has no authority to review the merits of the current appeal? [40]

(2) Did the Court of Special Appeals err in holding that counsel for Petitioner did not waive his client's right to challenge the compensatory damage awards?

(4) Does Maryland permit awards for emotional distress due to fear of developing cancer? If so, what is the appropriate standard?

(5) Should the emotional distress verdicts be overturned where the uniform awards ignored the substantial differences among Plaintiffs, evidence satisfying the standards of *Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979), for recovery of such damages was not presented, and the jury instruction permitted recovery for fear of cancer without

---

3. Should Plaintiffs' property damage expert's opinions have been admitted where he failed to use any generally accepted method of valuation and failed to consider actual sales?

4. Did ExxonMobil consent to the[ ] verdicts?

5. Did the in banc decision of the Court of Special Appeals violate § 1–403(c) of the Courts and Judicial Proceedings Article?

**40.** We concluded that the Court of Special Appeals may have an institutional interest in the resolution of this question, if reached by this Court. Thus, on 26 June 2012, we issued an order inviting the Attorney General of Maryland to submit an *Amicus Curiae* brief to address questions concerning the Court of Special Appeals's in banc procedure in the present case. We specified in the order that the Attorney General's brief "on behalf of the Court of Special Appeals" address only the issues raised by Respondents regarding the procedural posture of the intermediate appellate court's in banc decision, not the substantive merits of the case. The Attorney General filed its *Amicus Curiae* brief on 9 October 2012.

any evidence of exposure to the alleged carcinogen or that the exposure made it "reasonably probable" that a Plaintiff would contract cancer?

(6) Did the Court of Special Appeals err in holding that the "fear of cancer" jury instruction given at trial was erroneous and prejudicial?

(7) Does Maryland permit damages for medical monitoring and, if so, may such damages be awarded where a) no Plaintiff claimed to have any current disease caused by exposure to contaminant, b) there was no proof that any Plaintiff had a significantly increased risk of developing any disease, and c) as to many Plaintiffs, there was no proof of exposure?

(8) Should Respondents' property damage expert's opinions have been admitted where he did not use any generally accepted method of valuation and he did not use actual sales or valuations in his assessment of the diminution in value of Respondents' properties?

(9) May a jury's verdict that all of Plaintiffs' properties were worthless be upheld where (a) the properties were all still habitable and many had no contamination; (b) all experts testified that the properties retained substantial value; and (c) those properties which were sold all obtained a substantial price?

(10) Is a new damages only trial required when a jury's award of compensatory damages is not based on the Plaintiff's alleged injuries?

## DISCUSSION

### I. The Court of Special Appeals's In Banc Decision

■ We address first a threshold procedural issue raised by Respondents in their cross-petition: whether the Court of Special Appeals violated CJP § 1–403(c)[41] in its in banc

---

**41.** § 1–403(c) provides, in relevant part:

procedure here.[42] Respondents and Petitioner agree that we have the authority to resolve all issues in this case; however, Respondents contend that this Court has also the authority not to decide the issues presented to the Court of Special Appeals and, instead, resolve only this procedural issue, dismiss the Writ of Certiorari as to the others, and vacate the judgment of the Court of Special Appeals. We decline Respondents' invitation.

We begin our analysis with a brief summary of the in banc proceedings in the intermediate appellate court. As the court noted in its 6 March 2012 denial of the Respondents' second Motion for Reconsideration, the appeal before the in banc panel was argued before nine incumbent qualified judges of the Court of Special Appeals, a majority of which participated in deciding each of the issues on appeal. *Exxon Mobil Corp. v. Ford,* 204 Md.App. 274, 281, 40 A.3d 674, 678 (2012). The intermediate appellate court's March 6 ruling stated that three members of the court elected to disqualify themselves under Rule 2.11 of the Maryland Code of Judicial Conduct,[43] while

---

A hearing or rehearing before the court in banc may be ordered in any case by a majority of the incumbent judges of the court. Six judges of the court constitute a quorum of the court in banc. *The concurrence of a majority of the incumbent judges of the entire court is necessary for decision of a case heard or reheard by the court in banc.*

**42.** In its conditional cross-petition, Petitioner urged this Court to grant plenary review of this question.

**43.** Between the time that the three-judge panel heard argument in January 2011 and the in banc hearing in September 2011, the Maryland Judicial Ethics Committee published an opinion in response to requests from three undisclosed appellate judges who questioned whether they should participate in an appeal involving a corporate appellant-litigant in which two of the judges owned stock and in which the third had held recently stock that the judge had since sold. *See* 16 August 2011 Maryland Judicial Ethics Committee Opinion in Request Nos.2011–19, 2011–20, 2011–21. The ethics opinion disclosed that the appeal in question was from a judgment in "the amount of $147 million." The Committee opined that these interests did not amount to express grounds for disqualification, but that the judges may wish to consider whether recusal was appropriate based on a risk of a potential perception of impropriety.

another seat on the court was vacant when the case was argued.[44]  *Id.* at 276 n. 1, 40 A.3d at 675 n. 1.

Respondents contend that the in banc decisions that were not decided by a proper majority of the Court of Special Appeals—requiring, in their view, a seven-member majority— violate CJP § 1–403(c).  As a result of this violation, Respondents assert, this Court should withdraw or decline certiorari on all other issues not decided by a seven-member majority of the in banc panel, and reinstate the jury's verdict.  We hold, however, that the questions presented in the petitions that we granted bypassed the intermediate appellate court and are properly before this Court for review, assuming, for the sake of argument, that the arguments regarding CJP § 1–403(c) and the in banc decision have merit.

Even if we were to agree with Respondents' argument that the in banc panel did not decide certain issues by the requisite majority (which we do not so decide), our precedent allows us to treat the present appeal as if a writ or writs of certiorari had been granted on bypass "prior to entry of a proper judgment by the Court of Special Appeals."  *Wildwood Med. Ctr., LLC v. Montgomery Cnty.,* 405 Md. 489, 496, 954 A.2d 457, 461 (2008).[45]  In *Wildwood,* a member (Judge Theodore G. Bloom) of a three-judge panel of the Court of Special Appeals, in a case decided purportedly by a 2–1 vote, died before the opinion (which facially reflected him as the author of the majority opinion) was filed, leaving the remaining panel judges divided evenly as to the proper disposition of the appeal.  *Id.* at 493–94, 954 A.2d at 460.  Similar to the instant case, a threshold jurisdictional issue seemingly impeding our

---

**44.**  Judge Ellen M. Hollander, formerly an incumbent judge on the intermediate appellate court, was selected for a federal district court judgeship on the U.S. District Court for the District of Maryland.  Her vacancy on the state court was filled by Judge Stuart R. Berger, who was appointed in December 2011.  Neither Judge Hollander nor Judge Berger participated in the court's consideration of the appeal in this case.

**45.**  The Attorney General explained persuasively in its *Amicus Curiae* brief this particular ground for our review of the present case.

review of the merits in *Wildwood* was whether a decision arising from an improperly-constituted panel's facial opinion, which lacked a concurrence in the majority, under Section 1–403(b) of the Courts and Judicial Proceedings Article ("CJP") of the Maryland Code (1973, 2006 Repl.Vol.), prevents this Court from reviewing an appeal of that decision.[46] *Id.* at 494–96, 954 A.2d at 460–61. We determined that the consequence of Judge Bloom's death was to dissolve the "concurrence of a majority of the panel" that is "necessary for the decision of a case." *Id.* (quoting Md.Code (1973, 2006 Repl.Vol.), CJP § 1–403(b)). We held ultimately that the panel's decision and its posthumously-issued opinion and mandate were unauthorized because the judges had failed to achieve a concurrence of a panel majority. *Id.* at 495, 954 A.2d at 461. Although we concluded that the lack of majority nullified the intermediate three-member panel's decision and mandate, we held that this Court obtained jurisdiction to decide the merits by virtue of its authority to bypass the intermediate appellate court and consider appeals not yet decided by that court. *Id.*

Here, we granted both parties' petitions for Writs of Certiorari, which, as in *Wildwood*, enables us to consider and decide "all the issues that would have been cognizable by the intermediate appellate court." *Id.* (citing Md. R. 8–131(b)(2)).[47,48] Even if, as the Respondents argue here, the in banc decision

---

**46.** That statute provides:

*Sessions; panels; hearings in banc.*
(b) *Panels.*—A case before the Court of Special Appeals shall be heard by a panel of not less than three judges. The concurrence of a majority of a panel is necessary for the decision of a case.

**47.** Maryland Rule 8–131(b)(2) provides the authority for this Court's discretion to bypass the Court of Special Appeals in choosing to hear an appeal not yet decided by the intermediate appellate court:

(2) [e]xcept as otherwise provided in Rule 8–304(c), when the Court of Appeals issues a writ of certiorari to review a case pending in the Court of Special Appeals before a decision has been rendered by that Court, the Court of Appeals will consider those issues that would have been cognizable by the Court of Special Appeals.

**48.** This approach, as explained in its *Amicus Curiae* brief, is one of the Attorney General's suggested resolutions to this procedural issue.

attributed majority status erroneously to 6–3 and 5–4 rulings, thereby lacking a concurrence of a majority of the entire court under a possible reading of CJP § 1–403(c), then, under *Wildwood,* this Court nonetheless has the authority to review the issues of this appeal. Whether a majority of an in banc panel issued the underlying decision is of no moment to whether we have authority to decide the instant appeal.[49] For these reasons, we hold that, regardless of whether the in banc panel had a concurrence of a majority under CJP § 1–403(c), our precedent allows us to consider (and we shall) the merits of the appeals before us.[50] Before moving to the next question, we reiterate that we do not decide whether our intermediate appellate court brethren failed to comply with CJP § 1–403(c). We observe, however, that they gave thorough and comprehensive consideration of all issues in a complex and difficult case.

## II. Petitioner Did Not Waive its Right to Appeal Compensatory Damages Awards

Respondents contend that Petitioner's counsel waived Petitioner's right to appeal the compensatory damages awards when he made certain statements during opening and closing arguments. According to Respondents, Petitioner's waiver arose when Petitioner sought a "quid pro quo" arrangement

---

**49.** Respondents argue that *Lee v. State,* 69 Md.App. 302, 305–07, 517 A.2d 774, 775–76 (1986), *aff'd,* 311 Md. 642, 537 A.2d 235 (1988), supports their argument that the trial court's judgment must be affirmed. We disagree, primarily because *Lee* and the present case arise from two distinctly different procedural backgrounds. In *Lee,* the Court of Special Appeals was evenly divided on one issue, and therefore affirmed the trial court's judgment. Here, Respondents maintain that the decision of the intermediate appellate court is rendered null by its lack of majority concurrence of a seven-member majority. *Id. Lee* does not support the reasoning of Respondents' argument.

**50.** Respondents contend also that the in banc panel did not constitute a quorum of the eligible voting members. Section 1–403(c) of the Courts and Judicial Proceedings Article defines a quorum of an in banc panel as six members. As there were nine members of the intermediate appellate court who heard and decided the instant appeal, we need not address further this issue.

with the jury, promising the jury that Exxon would pay any compensatory damages awarded in exchange for the jury's decision not to award punitive damages. We see it differently and agree with the unanimous in banc panel of the Court of Special Appeals.

Respondents contend that, in Exxon's opening statement, Exxon's counsel "made it abundantly clear that the trial was not about compensatory damages but was about punitive damages[,]" quoting the following excerpt:

Well, it occurs to me at this point that you're probably wondering, if Exxon takes responsibility and accepts liability to pay compensatory damages for that harm, then why are we here? ... So, [Respondents' counsel] says we're trying to blame 'em. This, of course, is not true. Blame 'em for the—for the compensatory liability? No. I told you. We're paying that. Whatever you decide is right about that, we're paying that.

Respondents' claim relies also on the following excerpts of Petitioner's closing argument to the jury:

[W]e accept responsibility to pay for whatever damages you find occurred here, that's not blaming somebody else. That's saying it's us. We've taken responsibility. We pay. You find that people were hurt here, you charge us. We pay. Now, are we blaming people for punitive damages. Of course, not. We spent a lot of time proving to you they couldn't be guilty of punitive conduct because they didn't know.

[Respondents' attorney] argues to you that your verdict should send a message ... But his message can't be sent because he did not prove to you what he said he was going to prove to you about fraud. I want you to send a message that when a company makes a mistake and then does what it ought to do, which is take responsibility, apologize and try to make it right, that if a company stands up and does what it is supposed to do to make things right, that it will not be punished if all there is an accident. So it is not a reward, it is a withholding of punishment in order to send the message

we want you to behave like ExxonMobil behaved in this case.

(Emphasis added).

Regarding the compensatory damages for diminution in property value, Petitioner's attorney told the jury, also in his closing argument:

I'm not going to put up a chart where I tried to tell you what are the suggested numbers for each household. My reasoning is this: I do not want you to award even a dollar less than the amount you think it takes to make it right for each plaintiff household that you determine is actually harmed.

That's your call. I want you to make that decision. Not [Respondents' attorney]. Not somebody['s] expert. I want you to make that call.

Now, obviously, some homes are not impacted and some are, and you know the difference. Those with nondetects, those that are now nondetect, there's no impact. Those that have detections . . . then it's a question of how much.

These statements, Respondents contend, amounted to Petitioner forfeiting its right to appeal by its counsel's anticipatory acquiescence to the jury's verdict. We hold that these statements did not indicate that Petitioner's counsel acquiesced to the jury's judgment or waived Petitioner's right to appeal the subsequent judgments.

■■■ Waiver is conduct from which it may be inferred reasonably an express or implied "intentional relinquishment" of a known right. *Gould v. Transamerican Assocs.*, 224 Md. 285, 294, 167 A.2d 905, 909 (1961). "The doctrine of acquiescence—or waiver—is that 'a *voluntary* act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review.'" *Bd. of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 200, 725 A.2d 1027, 1032 (1999) (quoting *Franzen v. Dubinok*, 290 Md. 65, 69, 427 A.2d 1002, 1004 (1981)) (emphasis in original). The doctrine of waiver is also known as "estoppel, acceptance of benefits creating mootness, and acquiescence in judgment."

*Downtown Brewing Co. v. Mayor & City Council of Ocean City,* 370 Md. 145, 149, 803 A.2d 545, 547 (2002).

■■■■ A party's right to appeal may be waived only "where there is acquiescence in the decision from which the appeal is taken or by otherwise taking a position inconsistent with the right to appeal." *Grandison v. State,* 305 Md. 685, 765, 506 A.2d 580, 620 (1986). The waiver doctrine applies only to conduct that is necessarily "inconsistent" with the right to appeal. *Downtown Brewing,* 370 Md. at 149, 803 A.2d at 547; *see Turner v. Turner,* 147 Md.App. 350, 381, 809 A.2d 18, 35–36 (2002). "To take actions that are necessarily inconsistent with challenging a judgment, a party *must have knowledge of the nature and effect of the judgment.*" *Boyd v. Bowen,* 145 Md.App. 635, 666, 806 A.2d 314, 331 (2002) (emphasis added).

We concluded that a waiver of a right to appeal was warranted where a party accepted a condemnation award in the underlying proceeding, but later sought to appeal that same judgment. *See Downtown Brewing,* 370 Md. at 151, 803 A.2d at 548. We recognized that "the right to appeal may be lost by acquiescence in, or in recognition of, the validity of the decision below from which an appeal is taken.'" *Id.* at 149, 803 A.2d at 547 (quoting *Rocks v. Brosius,* 241 Md. 612, 630, 217 A.2d 531 (1966)).

■■■ Moreover, waiver by acquiescence is limited to a party's *post-*judgment conduct. Except for consent to a judgment, we have not applied waiver by acquiescence to conduct before entry of judgment, namely because a party cannot relinquish knowingly a right to appeal the nature and effect of a judgment before that judgment is known and entered. *Boyd,* 145 Md.App. at 666, 806 A.2d at 331.

In the present case, Respondents maintain that, before the return of the jury's verdicts and the entry of judgment, the Petitioner's counsel's statements to the jury in argument constituted acquiescence in what became the jury's verdict and a waiver of Petitioner's right to appeal the resultant entry of final judgment. The Circuit Court and the Court of Special Appeals rejected Respondents' waiver argument. We agree

with their reasoning. A reasonable view of the closing argument of Petitioner's counsel is that, by counsel saying "we pay," Petitioner's counsel asserted only his client's intention to take responsibility for its actionable and proven conduct affecting adversely Respondents. Counsel's other statements, taken within their context, urged the jury to award an appropriate compensatory award based on the properly admitted evidence at trial and proper jury instruction. Counsel's arguments illustrate strategic advocacy, rather than a blatant offer of a quid pro quo arrangement with the jury to avoid a punitive damage award.

In any event, the conduct of Petitioner's counsel occurred before the rendition of the jury's verdict and entry of judgment, and thus it is unreasonable for Respondents to argue that Petitioner could relinquish knowingly the right to challenge the jury's decision. As there was no implicit or express consent to the jury's actual judgment, we hold that the conduct of Petitioner's counsel was not inconsistent with the Petitioner's right to appeal the final judgment, and therefore did not amount to Petitioner's waiver of the right to appeal.

### III. Emotional Distress Damages for Fear of Cancer

In *Exxon Mobil Corp. v. Albright,* we addressed directly whether a plaintiff may recover emotional distress damages based on a fear of contracting a latent disease after tortious exposure to a toxic substance. 433 Md. at 349–64, 71 A.3d at 58–67. Exxon seeks here also reversal of the trial judge's denial of its motion for judgment not withstanding the verdict ("JNOV") regarding damages for fear of contracting cancer as well as medical monitoring. We review a trial court's decision to allow or deny judgment or JNOV to determine whether it was correct legally. *Jones v. State,* 425 Md. 1, 8, 38 A.3d 333, 337 (2012); *Scapa Dryer Fabrics, Inc. v. Saville,* 418 Md. 496, 503, 16 A.3d 159, 163 (2011). A party is entitled to JNOV "when the evidence at the close of the case, taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense." *Gallagher v. H.V. Pierhomes,* 182 Md.App. 94, 101, 957 A.2d

628, 632 (2008). Error in a denial of JNOV is found if the evidence "does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty." *Bartholomee v. Casey,* 103 Md.App. 34, 51, 651 A.2d 908, 916 (1994).

Respondents argue that the Court of Special Appeals erred when it concluded that the jury instruction on fear of cancer was erroneous and prejudicial. "The standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Univ. of Md. Med. Sys. Corp. v. Malory,* 143 Md.App. 327, 337, 795 A.2d 107, 113 (2001) (quoting *Farley v. Allstate Ins. Co.,* 355 Md. 34, 46, 733 A.2d 1014 (1999)). "This standard for reversible error places the burden on the complaining party to show both prejudice and error." *Farley,* 355 Md. at 46, 733 A.2d at 1020.

In *Albright,* we held that, to recover emotional distress damages for fear of contracting a latent disease, a plaintiff must show that (1) he or she was exposed actually to a toxic substance due to the defendant's tortious conduct; (2) which led him or her to fear objectively and reasonably that he or she would contract a latent disease; and, (3) as a result of the objective and reasonable fear, he or she manifested a physical injury capable of objective determination. 433 Md. at 363–64, 71 A.3d at 67. Hence, we hold that, viewed in the light most favorable to the Respondents, the evidence in this record is insufficient as a matter of law to support Respondents' claims for emotional distress damages based on a fear of contracting cancer. We hold further that, as the trial court's jury instructions did not cover fairly the standard for recovery that we have adopted, the jury instructions were erroneous.

The test results, at the maximum detection levels, for the potable wells on the Respondents' properties showed that the potable wells of seventeen [51] of the eighty-four properties did

---

51. There were other Respondents whose potable wells were labeled as "non-detects," but Petitioner appeals the damages awards for emotion-

not have any measurable MTBE contamination—labeled as "non-detects"—as a result of the leak. Results from the monitoring wells indicate that five of the properties contained contamination above the MTBE action level of 20ppb. Benzene above the 5ppb action level was not found in any of the Respondents' potable wells, although results of the monitoring wells indicate that four had benzene contamination above the action level.

Dr. Rudo, the toxicologist who testified as an expert witness on Respondents' behalf, testified that MTBE is a mutagen that causes changes in DNA, and, therefore, there is "no safe level" of exposure to MTBE. In contrast, the MDE (consistent with the EPA standard) has set an action level for MTBE at 20 ppb. Herbert Meade from the MDE testified that aesthetic standards, such as the MTBE 20–40 ppb standard, which is consistent with the EPA standard, do not evince any evidence of a risk to human health and are meant only to ensure acceptable odor and taste.

It is significant that none of the Respondents claimed sickness or symptoms of a disease attributable to the leak, despite their claims that they had a fear of contracting a latent disease. None of the Respondents claimed a physical injury, apart from emotional distress caused allegedly by the leak.[52] Some Respondents testified that they experienced emotional or psychological difficulties prior to the leak and some of them had sought treatment for their problems. Some Respondents stated that they had experienced stress unrelated to the leak, such as problems in their marriage or other relationships, or concerns about their health or health of family members. Lastly, we note that for those Respondents who elected to

---

al distress and medical monitoring costs for only seventeen of the total non-detect properties. The other non-detect properties are discussed in Section VI of this opinion.

**52.** Instead, Respondents testified to one or more (while others did not testify to any) of the following complaints, some related and some unrelated to the leak's impact: anxiety, sleeplessness, anger, worry about health and finances, headaches anxiousness, stress, frustration, embarrassment, depression, upset stomach, and panic attacks.

consult Dr. Malik regarding their emotional distress evalua-
tions, each evaluator relied in his or her later opinion on self-
reported information from Respondents. The evaluators did
not have medical records regarding those Respondents prior
to February 2006, and did not speak to any of the Respon-
dents' personal physicians.

### A. No Evidence of Actual Exposure That Would Give Rise to Objective Reasonable Fear

As there are no air samples or vapor studies in evidence to
demonstrate that breathing vapors may have caused exposure
to MTBE or benzene, the only evidence relevant to assessing
actual contamination and consequent exposure is that collected
from the Respondents' potable wells and the monitoring wells.
No other evidence was presented to show that exposure could
occur absent contamination in a potable well.

The evidence reflects that there are seventeen properties
for which there was no past or current evidence that the
potable wells were contaminated by the leak, or that would
become contaminated in the future. Respondents' experts
testified that the chance of future contamination of the wells
for these properties was "low," which they meant as unlikely
to occur. Further, Respondents owning these particular prop-
erties did not adduce any evidence that contamination was
present in the ambient air or water vapor in any of their
houses (including those using well water for bathing). Thus,
without proof of contamination in the potable wells on these 17
properties, there can be no ingestion or skin contact with
contaminated water. As there is no indicia that these Respon-
dents were in contact with any form of contamination as a
consequence of the leak, the likelihood of potential future
exposure is insufficient as a matter of law.

Despite the absence of proof of contamination, the Respon-
dents who own these seventeen properties received awards for
emotional distress damages based on fear of contracting can-
cer. In the absence of any exposure, there can be no objective
reasonable fear of cancer. The trial court erred in not grant-
ing Petitioner's motion for JNOV with respect to these Re-

spondents' emotional distress claims.[53]  We reverse the judgments and shall remand to the Court of Special Appeals with directions to remand to the Circuit Court and direct the entry of judgment in favor of Petitioner.

### B.   Insufficient Evidence of Actual Exposure That Would Give Rise to an Objectively Reasonable Fear

For the remaining Respondents' fears to be objectively reasonable, they must have a rational basis to apprehend reasonably that they would develop cancer as a result of exposure to the toxic substances of the leak.  The evidence presented at trial indicated that all Marylanders are exposed to toxic substances (some carcinogens, some mutagens) in our daily lives.[54]  As Judge James Eyler summarized aptly in his concurring and dissenting opinion in this case in the intermediate appellate court:

> People who pump their own gasoline are exposed to MTBE and benzene, by contact with or by breathing vapors.  People who drive many miles and fill their tanks often are more exposed than those who drive less.  People who keep gasoline in their homes for use in generators, lawn mowers, or other engines, have greater exposure than those who do not.  *In order to have a valid tort claim, a claimant must be different from the general population.*

204 Md.App. 1, 128–29, 40 A.3d 514, 590 (2012) (J. Eyler, dissenting and concurring) (emphasis added).  Claiming mere exposure to MTBE as a result of the leak is insufficient under the standard we adopted in *Albright*.  Based on the evidence presented, mere exposure to MTBE would not lead a reasonable person in the Respondents' position to believe that they will develop cancer.

---

**53.**  This group of Respondents is comprised of the Badders, Barnett/Lindsey, Benney, Berlin, Butler, Colgan, Copeland, Cormier, Fulco, Gollihue, Greenblatt, Jenkins, Lindsay, Merski, Montone, Nickel, and Oberlin households.

**54.**  For example, Respondents' expert, Dr. Rudo, testified that our food—such as mushrooms, coffee, peanut butter, or bread—contain carcinogens, and that certain other foods contain mutagens.

Respondents' claims arise from the same factual background as in *Albright.* In *Albright,* we determined that the rational basis for an objective and reasonable fear arising from the leak's toxic exposure was at the point a reasonable person under these circumstances would believe that a toxic chemical was actually present in their potable water.[55] 433 Md. at 365–66, 71 A.3d at 67–68. There is ample evidence and testimony that the exposure to MTBE above the MDE's action level of 20 ppb is still considered safe; however, the MDE chose the 20 ppb standard to measure the point at which an individual's level of tolerance to odor and taste is triggered. As we concluded in *Albright,* assuming that an objective reasonable fear of developing cancer may arise when an individual is exposed to a level of MTBE significantly beyond that which is deemed aesthetically tolerable, based on the MDE's 20 ppb level, we conclude that those individuals exposed to MTBE at levels below the 20 ppb do not have a rational basis to fear they will develop cancer. 433 Md. at 367–68, 71 A.3d at 69. Moreover, Meade, on behalf of the MDE, stated at trial that the water was safe to use, and that he communicated this information to several Respondents.

Hence, those Respondents belonging to the sixty-three households whose properties' potable wells were tested with results below the MDE 20 ppb action level do not have an objective reasonable fear, as a matter of law, that they may develop cancer as a result of exposure to the leak.[56] We

---

**55.** We do not consider whether Respondents, as a matter of law, could fear reasonably that they were exposed to MTBE and could develop cancer when Exxon's agents/employees distributed water bottles to the Jacksonville residents, or when they discovered the extent of the leak through the media, neighborhood meetings, or by other means. As discussed above, the only form of undisputed evidence relevant to determining an objectively reasonable fear in this case is the evidence of contamination in the properties' potable wells and the results of the properties' monitoring wells.

**56.** These households are: Acchione, Alban, Albert, Babcock, Barone, Bateman, Batton, Bieber, Blair, Cadigan, Carroll, Coffay, Cremen, Csicsek, Davis, Debolt, Dedeo, De Koomen, Depasquale, Diedeman,

reverse those judgments entered in favor of these Respondents and remand to the Court of Special Appeals with directions to remand to the Circuit Court and direct the entry of judgment in favor of Petitioner.

### C. Legally Insufficient Evidence of Demonstrable Physical Injury as a Result of Exposure

None of the Respondents' evidence or testimony provided sufficient manifestation of physical injury as a matter of law. As we discussed in *Albright*, to sustain an award for emotional distress for fear of cancer, a plaintiff must prove that as a result of actual exposure and his or her objective reasonable fear, he or she sustained an objectively demonstrable physical injury manifesting emotional distress, which may include a mental state, physiological or psychological symptoms, or an actual physical harm. 433 Md. at 358–64, 71 A.3d at 63–67. Pursuant to *Vance v. Vance*, 286 Md. 490, 500–01, 408 A.2d 728, 733–34 (1979), and *Hunt v. Mercy Med. Ctr.*, 121 Md.App. 516, 524–25, 710 A.2d 362, 366 (1998), a physical injury is manifested and objective if the evidence is not conclusory or speculative, and provides some quantifiable basis for the jury to determine the appropriate award.

The trial court erred in denying Petitioner's motion for JNOV with respect to the emotional distress awards entered in favor of Respondents who did not testify, and therefore presented no evidence to show that they experienced any emotional distress.[57] We reverse those judgments and remand to the Court of Special Appeals with direction that it remand to the Circuit Court and direct the entry of judgment in favor of Petitioner.

---

DiGalbo, Dixon, Dobb, Faber, Facinoli, Flora, Ford, Fox, Fritz, Gottschalck, Greco, Gregory, Hannan, Heggie, Hourihan, Howe, Kropfelder, Kukucka, Lamos, Lanting, Mahoney, Martin, Mucha, Osmeyer, Peters, Pfeiffer, Quinn, Rosch, Rush, Schech, Schultz, Shimp, Sipes, Thompson, Tirocchi, Tolle, Twardzik, Vacovsky, Vogler, Wiedey, and Wittelsberger.

**57.** These Respondents are: David Fritz, Jr., Brendan Fritz, Aidan Fritz, and Melodie Heggie.

The trial court erred in denying Petitioner's motion for JNOV regarding the awards for emotional distress entered in favor of Respondents who briefly and intermittently mentioned in testimony and provided minimal-to-no evidence of emotional distress.[58]   These Respondents' evidence of physical injury, if any, did not demonstrate physical injuries of an objective and quantifiable nature.   The evidence they did present did not indicate any objective and demonstrable injury arising from exposure to the leak because it included only the following:  (1) proof that any emotional stress resulted from a concern about property damages only, such as the loss of use and enjoyment, rather than human health or safety;  (2) proof that any emotional stress was due to preexisting mental or emotional conditions or was attributed to the maintenance of the litigation;  and, (3) lack of sufficient physical manifestation.

Most of these Respondents did not provide any supporting medical testimony as to their emotional distress.   Further, these Respondents, based on the opinion of their expert, Dr. Rudo, asserted that their physical injuries included subcellular changes as a result of exposure to MTBE's likelihood of causing cell mutation and increasing the risk of cancer.   As discussed in *Albright,* however, such injuries are not compensable in Maryland without symptoms of disease or actual impairment.   433 Md. at 362, 71 A.3d at 66.   There is no such evidence or testimony in this record.   We reverse those judgments and remand to the Court of Special Appeals with directions to order remand to the Circuit Court for the entry of judgment in favor of Petitioner.

Our holdings by no means exclude the filing of future actions by those Respondents who may develop, unfortunately, a future latent disease as a result of exposure to the 2006 leak. Such claims would not be barred by res judicata or the statute of limitations:  the tolling period for causes of action for latent

---

**58.**   These Respondents are:  Thomas Anderson, Stacey Curtiss, Mirza Baig, Zain Baig, Martin Brady, Cassandra Brady, Matthew Fox, Michele Shindledecker, Edward McLewee, Barbara McLewee, Steven Tizard, and Tracey Tizard.

disease would begin to run only when a plaintiff knew or should have discovered reasonably the nature and cause of the disease. *See Hecht v. Resolution Trust Corp.*, 333 Md. 324, 334, 635 A.2d 394, 399 (1994); *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 663, 464 A.2d 1020, 1025 (1983).

## IV. Compensatory Damages for Future Costs of Medical Monitoring

Maryland recognizes now a remedy of recovery for medical monitoring costs due to enhanced risk from sufficient exposure to toxic substances resulting from defendant's tortious conduct. *Albright*, 433 Md. at 381–82, 71 A.3d at 77–78. Petitioner argues that the trial court erred in denying its motion for JNOV regarding damages for medical monitoring. Respondents urge us to affirm the jury's awards for medical monitoring costs to all of the Respondents. Our consideration of these contentions requires us to view the evidence in the record "taken in the light most favorable to the nonmoving party." *Gallagher*, 182 Md.App. at 101, 957 A.2d at 632. Viewing the evidence in that light, we conclude that it was insufficient to sustain the jury's awards for medical monitoring and thus hold that the trial court was legally incorrect in denying Petitioner's motion for JNOV.

To sustain an award for recovery of medical monitoring costs, a plaintiff must show that such costs are necessary due to a reasonably certain and significantly increased risk of developing a latent disease as a result of exposure to a toxic chemical. *Albright*, 433 Md. at 389–90, 71 A.3d at 83. In determining whether to award relief, a court must consider whether the plaintiff has shown: (1) that the plaintiff was exposed significantly to a proven hazardous substance through the defendant's tortious conduct; (2) that, as a proximate result of significant exposure, the plaintiff suffers a significantly increased risk of contracting a latent disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; and (4) that monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial. *Id.* To determine what is a "significantly increased risk of contracting a latent

disease" for a particular plaintiff, the plaintiff must present quantifiable and reliable medical expert testimony that indicates the individual plaintiff's particularized chances of developing the disease had he or she not been exposed, compared to the chances of the members of the public at large of developing the disease. *Id.*

Here, the jury awards indicated that if, at any point in time, a household's potable well had a MTBE reading above 0.5 ppb, the members of that household received 100% of his or her claimed costs for future medical monitoring; if the MTBE reading was less than 0.5 ppb, that individual received 50% of his or her claimed costs for future medical monitoring; and, lastly, if a household's potable well never tested positively for MTBE, each member of that household nonetheless received 25% of his or her claimed future medical monitoring costs. As discussed in our summary of the contamination results in Section II of the procedural history of this case, tests of the potable wells on the all properties showed that seventeen properties did not suffer any contamination as a result of the leak. Monitoring well results show that benzene levels above the action level were found only in five of the Respondents' potable wells, while six of the properties contained contamination above the MTBE action level.

Those Respondents who owned and/or resided on properties where the potable well lacked any contamination failed to show exposure to a toxic substance, which is a threshold requirement to recover for medical monitoring.[59] Although Cohen, one of Respondents' hydrogeologist experts, testified that the potential for future contamination of these non-detect properties was possible, he could not predict which well or wells might become contaminated in the future or when. The possibility of future contamination for these non-detect properties is therefore too speculative. With respect to these

---

**59.** These households are: Badders/Shoemaker, Barnett/Lindsey, Berlin, Butler, Colgan, Copeland, Cormier/Healey, Copeland, Fulco/Hogan, Gollihue, Greenblatt/Robertson/Kiefer, Jenkins/Ripken, Lindsay/Parks, Merski, Montone, Murray, Nickel, Oberlin, Pertee, and Simms. *See supra* note 51.

claims, the trial court erred in denying Petitioner's motion for JNOV. We reverse those judgments and remand to the Court of Special Appeals with directions to remand to the Circuit Court for entry of judgment in favor of Petitioner.

As discussed in our analysis related to emotional distress damages for fear of contracting cancer, the evidence demonstrates that most Marylanders are exposed to MTBE every day. Evidence at trial demonstrated that exposure to MTBE above the 20 ppb action level is still considered safe, and that the selected 20 ppb standard measures merely the point at which an individual's level of tolerance to the odor and taste of MTBE in water becomes an impediment to its consumption. Those who are exposed to MTBE or benezene at well-recognized safety levels are no more at risk of developing a latent disease than the rest of the population—much less face a *significantly* increased risk in relation to other Marylanders' exposure to MTBE. Hence, those Respondents whose properties tested below 20 ppb are not suffering, as a matter of law, a significantly increased risk of developing a latent disease for which medical monitoring costs are necessary.[60] We hold that the trial court erred in denying the Petitioner's motion for JNOV regarding these Respondents' judgments, and thus reverse those judgments, and remand to the Court of Special Appeals with directions to remand to the Circuit Court for entry of judgment in favor of Petitioner.

Lastly, Respondents from the remaining six households [61] also have not demonstrated a significant risk of developing a

---

**60.** This group of Respondents includes the following households: Acchione, Alban, Albert, Babcock, Barone, Bateman, Batton, Bieber, Blair, Cadigan, Carroll, Coffay, Cremen, Csicsek, Davis, Debolt, DeDeo, De Koomen, DePasquale, Diedeman, DiGalbo, Dixon/Elkington, Dobb, Faber, Facinoli, Flora, Ford, Fritz, Gottschalk, Greco, Gregory, Hannan, Heggie, Hourihan, Howe, Kropfelder, Kukucka, Lamos, Lanting, Mahoney, Martin, Mucha, Murray, Osmeyer, Peters, Pfeiffer, Quinn, Rosch, Rush, Schech, Schultz/McDevitt, Shimp, Simms, Tamberino, Thompson/Chavez, Tirocchi, Tolle, Twardzik, Vacovsky, Vogler, Wiedey/Wilkinson/Stelmack, Wittelsberger.

**61.** These Respondents are Thomas Anderson, Stacey Curtiss, Mirza Baig, Amtul Baig, Zain Baig, Martin Brady, Cassandra Brady, Matthew

disease in the future because the expert testimony did not indicate that any individual faced a particularized and significantly increased risk as a result of the leak in relation to the public at large. We concluded in *Albright* that particularized evidence is necessary to prove a "significantly" increased risk of developing a future disease, such as medical testimony specifically noting a plaintiff's individually increased risk to develop cancer. 433 Md. at 381–88, 71 A.3d at 77–82.

No such evidence was presented in this case. Although some Respondents consulted with Dr. Malik and were evaluated for their described symptoms, neither Dr. Malik nor Dr. Brautbar indicated any particularized evidence that an individual Respondent faced an increased risk of developing a future disease that was significantly higher than similar risks posed to the general population. Rather, Respondents' expert testimony generalized that all Respondents faced a significantly increased risk of developing a future disease, without providing individual assessments of any Respondent. Accordingly, the trial court erred in denying the Petitioner's motion for JNOV with regard to these Respondents. We reverse those judgments and remand to the Court of Special Appeals with directions to direct entry of judgment in favor of Petitioner.

## V. Property Damages

Respondents sought damages for diminution in their property values as a result of the leak. The jury found that all of their properties had become worthless, and awarded the owners of each home 100% of the pre-leak market value based on (1) the difference in market value prior to and subsequent to when notice of the leak became public; and, (2) loss of use and enjoyment for the time between the date of the leak to the commencement of trial. Judge Baldwin granted Petitioner's blanket post-trial motion challenging the award, but as to only three Respondents' households who had sold their homes

---

Fox, Michele Shindledecker, Edward McLewee, Barbara McLewee, Steven Tizard, and Tracey Tizard.

following the leak,[62] reducing the award to the difference between the full pre-leak value and the actual sales price. The court denied Petitioner's motion for a new trial or remittitur for the judgments awarded to the remaining households whose properties had not been sold after the leak.

Petitioner appeals Judge Baldwin's denial of its motion for a new trial or, in the alternative, a remittitur (on the basis of excessive compensatory damages) because (1) the testimony of Respondents' real estate appraisal expert, Kenneth Acks, was inadmissible; (2) Respondents produced insufficient evidence to warrant a jury verdict finding that their properties were worthless; and (3) the evidence shows that those Respondents' properties retained substantial post-leak value.

We hold that the trial court was correct in admitting Acks' expert testimony. Nevertheless, we hold also that, because no competent evidence in this record indicated that Respondents' properties had "zero value," the trial court's denial of Petitioner's motion for JNOV or a new trial was erroneous. Thus, Respondents shall receive a new trial for their claims of property damage based on diminution in value, in light of our decision in *Albright,* 433 Md. at 395–426, 71 A.3d at 86–105.

## A. Standards of Review

Ordinarily, an abuse of discretion standard governs appellate scrutiny of the admissibility of expert testimony and the denials of motions for a new trial or remittitur. We will find an abuse of discretion when the court's ruling is "clearly against the logic and effect of facts and inferences before the court[,]" when the decision is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result[,]" when the ruling is "violative of fact and logic[,]" or when it constitutes an "untenable judicial act that

---

**62.** The Brady household sold their home for $679,500 (a 6.9% decline from its pre-leak value). The Csicsek household sold their home for $767,000 (a 10.3% decline from its pre-leak value). The Simms household sold their home for $505,000 (a 16.6% decline from its pre-leak value).

defies reason and works an injustice." *Powell v. Breslin,* 430 Md. 52, 62, 59 A.3d 531, 537 (2013) (citing *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031 (1994) (internal quotation marks omitted)). Thus, the admissibility of expert opinion "is within the sound discretion of the trial judge and will not be disturbed on appeal unless clearly erroneous." *Blackwell v. Wyeth,* 408 Md. 575, 618, 971 A.2d 235, 261 (2009) (quoting *Wilson v. State,* 370 Md. 191, 200, 803 A.2d 1034, 1039 (2002)); *see Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472, 476 (1977) ("[T]he trial court's determination [regarding expert qualification] . . . may be reversed if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion.").

When a trial judge denies a motion for a new trial and/or remittitur based on the excessiveness of compensatory damages, we consider his or her exercise of discretion based on "whether the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'" *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969, 976 (1988). The grant or denial of a motion for a new trial is "within the sound discretion of the trial court." *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 56, 612 A.2d 1294, 1296 (1992) (quoting *Brinand v. Denzik,* 226 Md. 287, 292, 173 A.2d 203, 206 (1961)). We reverse the trial court's denial of a motion for a new trial and/or remittitur only upon a showing that the trial court abused its discretion. *See Merritt v. State,* 367 Md. 17, 28, 785 A.2d 756, 763 (2001).

B. Admissibility of Kenneth Acks' Testimony [63]

The admissibility of expert testimony generally is subject to evaluation according to three requirements: (1) the

---

**63.** Petitioner contends that "[u]nder Maryland Rule 5–702 and *Frye–Reed,* Acks' opinion should not have been admitted." The question of whether Acks' testimony is admissible is governed by Maryland Rule 5–702 rather than the *Frye–Reed* test. The latter is reserved for issues admissibility of expert testimony involving new or novel scientific

witness qualifies as an expert on the topic about which he or she intends to testify; (2) the subject is appropriate for expert testimony; and (3) there is an adequate factual basis supporting the testimony. Md. R. 5–702. The last factor includes two sub-issues: factual basis and methodology. *CSX Transp. Inc.*, 159 Md.App. at 189, 858 A.2d at 1063. "[S]imply because a witness has been tendered and qualified as an expert in a particular occupation or profession, it does not follow that the expert may render an unbridled opinion which does not otherwise comport with Maryland Rule 5–702." *Giant Food, Inc. v. Booker*, 152 Md.App. 166, 182–83, 182, 831 A.2d 481, 490 (2003). Instead, sufficient facts must underlie the expert's opinions that indicate the use of "reliable principles and methodology in support of the expert's conclusions" so that the opinion constitutes more than mere speculation or conjecture. *Id.*

■■■ "Expert testimony is required ordinarily to establish diminution in property value resulting from environmental contamination." *Albright*, 433 Md. at 418, 71 A.3d at 100; *Hous. Auth. of City of New Brunswick v. Suydam Investors, LLC*, 355 N.J.Super. 530, 810 A.2d 1137, 1150 (Ct.App.Div. 2002) ("[T]he effect of environmental contamination upon a property's value must be determined on the basis of expert appraisal evidence."), *aff'd in part and rev'd in part on other grounds*, 177 N.J. 2, 826 A.2d 673 (2003).

In evaluating the factual basis of an expert's testimony, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Md. R.

techniques. *Wilson v. State*, 370 Md. 191, 201 n. 5, 803 A.2d 1034, 1040 n. 5 (2002); *see CSX Transp. Inc. v. Miller*, 159 Md.App. 123, 187–88, 858 A.2d 1025, 1061–62 (2004) (explaining what is encompassed as a "new and novel scientific technique" under the *Frye–Reed* test). Maryland Rule 5–702, on the other hand, applies to the discretionary threshold of admitting generally an expert's testimony. *Id.* As *Frye–Reed* is not applicable to the present situation, we review the admission of Acks' testimony under an abuse of discretion standard pursuant to Maryland Rule 5–702.

5–703(a). If those facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." *Id.*

Acks' estimation of property values in the instant case was buttressed by the following facts and data: (1) the stipulated pre-leak appraised values of the Respondents' homes; (2) the presence of actual potable well contamination; (3) another expert's determinations of the risk of future contamination; [64] (4) whether people have been able to sell homes within a one mile radius of the Exxon station; and (5) peer-reviewed articles discussing diminution in property value in other contamination events. Based on this collection of facts and data, Acks concluded that properties with evidence of contamination had decreased in value by 60%; properties with a high probability of future contamination had decreased in value by 50%; properties with a medium probability of future contamination had decreased in value by 45%; and properties with a low probability of future contamination had decreased in value by 30%.

Petitioner challenges the admission of Acks' testimony under the third requirement of Maryland Rule 5–702, asserting that (1) the methodology underlying his diminution in value estimates was unreliable; and (2) those estimates lacked a sufficient factual basis because he ignored actual comparable sales of real property within proximity of those properties affected by the leak. We disagree.

Petitioner first asserts that Acks' conclusions "ignored" the comparable sales of forty-nine properties, five of which belonged to plaintiffs, located near or within a half-mile radius of the strike line. Comparable sales are often utilized in determining fair market value of single-family residential properties, and "ha[ve] long been accepted in Maryland." *Albright,*

---

**64.** Additionally, Acks relied on test readings of wells on various properties taken after the leak, but before trial, and an exhibit prepared by Sullivan, one of Respondents' hydrogeology experts, reflecting Sullivan's opinion as to whether properties with no contamination had a low, medium, or high chance of becoming contaminated in the future.

433 Md. at 423, 71 A.3d at 103; *Bern–Shaw Ltd. P'ship v. Mayor & City Council of Balt.*, 377 Md. 277, 289, 833 A.2d 502, 509 (2003) (citing *Brinsfield v. City of Balt.*, 236 Md. 66, 202 A.2d 335 (1964)) (discussing use of comparable sales in condemnation cases). The use of comparable sales data, however, is not the only methodology accepted to appraise the fair market value of a residential property. *See Albright*, 433 Md. at 423–24, 71 A.3d at 103–04. The record indicates that, rather than ignoring the data of comparable sales in the strike line area, Acks thought the comparable sales were of minimal use to his assessment of the value of Respondents' properties, either because (1) the four properties sold by plaintiffs since the leak were "low-hanging fruit," [65] and thus not indicative necessarily of the overall diminution in value of the other properties, or (2) the lack of pre-leak appraisals for the other approximately forty-five properties [66] sold by non-parties between the date of the leak and the date of trial was not available, and he believed it was impossible to conduct an accurate appraisal based only on sales price.[67]

Acks recognized thus the existence of the comparable sales data and explained his reasons for rejecting or minimizing the utility of that information in his appraisal calculations, rather than completely rejecting the use of such data, as alleged by Petitioner.[68] We agree with the view of Judge Zarnoch of the Court of Special Appeals in the present case, that "there is no

---

65. These properties were owned and sold by the Brady, Csicsek, Simms, and Murray households. The trial court granted Exxon's motion for remittitur as to the diminution in value claims of these households, reducing each award to an amount equal to the difference between the pre-leak adjusted value and the actual sales price.

66. Acks testified based on a map presented at trial that reflected forty-nine sales (the most current number at the time of his deposition), but the map was updated for trial to reflect fifty-two sales.

67. In Acks' words, "A home could sell for a million dollars, and that might sound like a lot, but if it's really a $3 million home, then there's a big diminution."

68. Acks' recognition, but exclusion, of the comparable sales data stands in stark contrast to the exclusion of such data by the appraisal expert in

support in Maryland case law for the proposition that a *reasoned decision* not to incorporate such data, *due to the particular circumstances of the case,* mandates the exclusion of the expert's testimony." *Ford,* 204 Md.App. at 29–30, 40 A.3d at 531 (Zarnoch, J.) (emphasis added).

Likewise, the exclusion of market fluctuations in Acks' appraisals did not render his testimony inadmissible. Acks considered the data of the 2006, 2007, and 2008 Baltimore County housing market provided by the Maryland Association of Realtors, but concluded that, as the market went up in 2006 and 2007, but dropped in 2008, the fluctuations were not helpful in his assessments. Petitioner's claim that Acks did not reach the same conclusions as its own expert, based on the same data, is a "critique going to the weight, not the admissibility, of Acks' testimony. [Petitioner] properly addressed it during cross-examination of Acks and its direct examination of its own property value expert." *Ford,* 204 Md.App. at 28–29, 40 A.3d at 530. (Zarnoch, J). We therefore conclude that Acks' testimony was admissible, despite his minimization of market fluctuation data.

Lastly, we examine Petitioner's assertion that Acks' methodology rendered his testimony inadmissible. Petitioner contends that Acks used " 'combined' aspects of various methodologies," instead of a single commonly accepted appraisal method. To constitute reliable methodology, "an expert opinion must provide a sound reasoning process for inducing its conclusion from the factual data" and must have "an adequate theory or rational explanation of how the factual data led to the expert's conclusion." *CSX Transp., Inc. v. Miller,* 159 Md.App. at 202–03, 858 A.2d at 1071. The explanation must not be conclusory, or constitute a "because I say so" approach. *Wood v. Toyota Motor Corp.,* 134 Md.App. 512, 525, 760 A.2d 315, 323 (2000) (concluding that the trial judge had not erred in excluding an expert's opinion where the

*Albright,* who concluded merely that such information was unreliable and the buyers for those properties were uninformed. 433 Md. at 418–26, 71 A.3d at 100–05.

expert determined that the cause of the plaintiff's injuries was the size and location of the vent holes in an air bag in a motor vehicle, but provided no rational explanation why such information had anything to do with the injuries sustained).

Acks stated that he employed a combination of methods because, in his experience, the leak presented an unusual situation requiring several methods to obtain the most accurate appraisal of the leak-impacted properties. Further, he cited a peer-reviewed publication that recommended the use of several "techniques" of valuation in instances of toxic substance contamination of groundwater in rural areas.[69] In contrast to the expert testifying for the respondents in *Albright*, 433 Md. at 422–26, 71 A.3d at 102–05 (where he relied on a nuanced view of "market price" and informal interviews with real estate agents to conduct his estimations), Acks testified that his methodology included the peer-reviewed PCB contamination study and other studies, such as one assessing, by surveying potential buyers, how an underground storage tank leak impacted the value of residential properties.[70] Acks considered also a study that examined the effect of pre-sale environmental disclosure requirements, from which he concluded that "a lot of people use data points to come up with relatively low value diminutions which really aren't very relevant because [potential buyers] don't know about the contamination or don't understand it." [71]

---

**69.** Robert Simons, *Estimating Proximate Property Damage for PBC Contamination in a Rural Market: A Multiple Techniques Approach*, LXX Appraisal J. 388 (October 2002).

**70.** Robert A. Simons & Kimberly Winson–Geideman, *Determining Market Perception on Contamination of Residential Property Buyers Using Contingent Valuation Surveys*, 27 J. Real Estate Research 193 (2005). The authors of this article, according to Acks, discarded the survey results of potential buyers because of their expressed belief that they would never bid on the property or would bid only one percent of the property value. Acks found the latter basis unrealistic and "very conservative."

**71.** Robert Berrens et al., *The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community*, 84 Social Sci. Q. 359 (2003).

Respondents' expert's testimony indicates that, although he did not identify a peer-reviewed article sanctioning the exact combination of methods he employed, he provided a "sound reasoning process" for how his methodology produced his appraisals of the diminution in value of Respondents' properties. *See CSX Transp.*, 159 Md.App. at 202, 858 A.2d at 1071. As Judge Zarnoch explained aptly for the unanimous Court of Special Appeals in banc panel, "[r]eal estate appraisal is not an exact science in the same way as automobile engineering or DNA comparison. [Petitioner] raises legitimate concerns about Acks's methods, but these criticisms go to the weight, not the admissibility, of his testimony." *Ford,* 204 Md.App. at 31, 40 A.3d at 532 (citing *Thomassen Lincoln–Mercury, Inc. v. Goldbaum,* 45 Md.App. 297, 305, 413 A.2d 218, 223 (1980) (concluding that "appellant's complaints about the manner in which [an expert witness] derived and stated his opinion as to value go to the weight to be accorded his testimony rather than to its admissibility.")).

For expert testimony to be admissible, his or her conclusions must be based on a sound reasoning process explaining how the expert arrived at those conclusions. Here, Acks' calculations included consideration of market fluctuations and recognition of comparable sales data, using a combination of reasonably explained methods, but did not reach the same conclusions as Petitioner's experts based on that information. The trial court thus did not abuse its discretion in finding Acks' testimony admissible.

### C. Respondents May Not Recover Emotional Distress for Injury to Real Property, But May Recover for Damages for Diminution in Property Value

#### 1. Emotional Distress Damages for Injury to Real Property

In addition to recovering for emotional distress damages for fear of cancer, Respondents sought and recovered damages for the diminution in value of their properties; the loss of use and enjoyment of their properties; nuisance

due to annoyance, embarrassment, inability to use their yards, noise, dust, and unusual traffic; and, anxiety about the loss in value of their properties. Petitioner challenges these judgments in its conditional cross-petition, arguing that Maryland law denies compensation for emotional distress resulting from damage (or fear of damage) to property. Petitioner therefore asks us to adopt Judge James Eyler's dissenting and concurring opinion in *Ford* reversing the emotional distress awards and allowing only thirty-five of the Respondents to pursue emotional distress claims at a new trial. In light of our decision in *Albright*, 433 Md. at 395–98, 71 A.3d at 86–88, we hold that Maryland law does not recognize ordinarily recovery for emotional distress resulting from injury to real property, and therefore reverse all judgments of such awards to all Respondents.

We recognized in *Albright* that ordinarily, absent evidence of fraud or malice in the underlying tort, emotional distress resulting from property damage (or fear of property damage) is not compensable in Maryland. *Albright*, 433 Md. at 396–97, 71 A.3d at 87; *Ford*, 204 Md.App. at 101, 40 A.3d at 573 (Eyler, J., concurring and dissenting in part). *See also H & R Block, Inc. v. Testerman*, 275 Md. 36, 48–49, 338 A.2d 48, 55 (1975), *abrogated on other grounds by Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), (recognizing that "Maryland decisions have generally denied compensation for mental anguish resulting from damage to property"); *Zeigler v. F. Street Corp.*, 248 Md. 223, 226, 235 A.2d 703, 705 (1967) (emotional distress damages attendant to injury to property may be recovered only where there is fraud or malice). As the jury rendered judgment in favor of Petitioner for Respondents' claims of fraud (*see supra* Section V of procedural history), the judgments for emotional distress damages related to fear of lost property value entered for the Respondents were erroneous. Those awards are therefore reversed.

2. Recovery for Diminution in Property Value

When trial began, Petitioners sought damages for diminution in their properties' market values and the loss of

use and enjoyment, with each owner claiming damages for the difference between the fair market value of property before disclosure of the leak and its fair market value after disclosure. The evidence at trial focused on the post-leak value because the parties stipulated to the pre-leak value of those properties.

First, we note that Andrea Greco and Veronica Greco withdrew their claims for property damages and resulting diminution in value. Nonetheless, they received property damages equal to the full pre-leak value of their property. Thus, the Circuit Court erred in denying Petitioner's motion for JNOV with respect to the Grecos' claims. We reverse that judgment and remand to the Court of Special Appeals with directions to remand to the Circuit Court for the entry of judgment in favor of Petitioner.

Second, in light of *Albright*, those Respondents here who owned or resided in non-detect properties [72] failed similarly to show a substantial interference sufficient to sustain actions for nuisance, trespass, negligence, or strict liability. *Albright*, 433 Md. at 409–15, 71 A.3d at 95–98. Apart from complaints of modest disturbances (such as using bottled water, reducing the use of outdoor spaces, or taking shorter baths and showers) and allegations that their properties are tainted by perceived stigma, the evidence indicates that any adjustments Respondents made to the use of their properties was out of fear of possible contamination. As their properties lacked any tangible evidence of contamination, such fear is not objectively reasonable for purposes of making a prima facie showing of nuisance. *Id.* at 412–14, 71 A.3d at 97. There was no evidence that Respondents were deprived of any part of their properties or that Exxon's remediation efforts and the consequences of the leak impaired greatly Respondents use and enjoyment of their properties. Hence, "[i]n the absence of

---

72. The Badders/Shoemaker, Barnett/Lindsey, Benney, Berlin, Butler, Colgan, Copeland, Cormier/Healey, Fulco/Hogan, Gollihue, Greenblatt/Robertson, Hahn, Jenkins, Lindsay/Parks, Merski, Montone, Nickel, Oberlin, and Pertee properties' wells never showed any contamination.

physical injury to property resulting from Exxon's actions, [Respondents] must demonstrate more than modest adjustments in their use of their real property resulting from the leak in order to establish nuisance." *Albright,* 433 Md. at 411, 71 A.3d at 96.

Third, as the remaining Respondents requested damages for diminution in value based on the difference between their properties' pre-leak fair market value and fair post-leak market value (essentially, full compensation for a permanent injury), we presume that Respondents' property damage claims were based on their properties' allegedly permanent diminutions in value. The evidence presented at trial—namely, Acks' expert testimony, the evidence of contamination as to some of Respondents' properties, the evidence and testimony of Petitioner's experts that there was substantial value retained by Respondents' properties—raises a question for the jury as to whether Respondents sustained damages for diminution in value, in light of our holdings in *Albright.* Hence, we hold, on remand, that those Respondents may recover only for damages to their property resulting in diminution of his or her property's market value, in light of our decision in *Albright,* 433 Md. at 395–426, 71 A.3d at 86–105.

### D. Respondents' Lay Testimony Lacked Value Probative of Diminution in Market Value

Petitioner asserts that the jury's finding that each property was "worthless" was contrary to all of the evidence. Petitioner maintains, and we agree, there was evidence showing that: Respondents' properties retained some market value after disclosure of the leak; although two of the eight Respondents who decided to sell their homes post-leak were unsuccessful,[73] four were successful in selling their properties;[74] evidence showed that owners of ten properties were able to procure refinancing; and approximately forty-five properties sold by

---

73. These were the Barone and Gregory families.

74. These were the Brady, Csicsek, Simms and Murray households.

non-parties within the Jacksonville strike line were sold for substantial prices after public disclosure of the leak.

Petitioner argues that the lay witness testimony had no probative value—or if it did, that value was limited to the homes of those owners.[75] We hold that none of the Respondents' lay testimony had any probative value as to the measure of damages for diminution in property value and, thus, that the lay testimony was insufficient to support the jury's verdict that the Respondents' properties were worthless.

Owners of seventy-three of the eighty-seven properties involved presently in this litigation testified as to their own opinion of their properties' post-leak value or as to the marketability of other properties in the neighborhood.[76] These owners either expressed no opinion on the value of their properties,[77,78] or testified that (1) their property diminished in

---

**75.** Respondents assert repeatedly that Petitioner did not object to the lay testimony, thereby waiving the right to challenge the probative value of the testimony. Whether Petitioner objected to such testimony is irrelevant in determining the probative value of the lay testimony. As Judge Deborah Eyler noted succinctly in her concurring and dissenting opinion in *Ford:*

The absence of an objection is meaningless to the analysis of this issue, . . . The central sufficiency question on property damage was whether the evidence was legally sufficient to support a reasonable finding that the homes all were worth nothing. As in any case, evidence to support a finding must be probative of it. *Evidence that otherwise is not probative does not become probative merely because it was not objected to.*

204 Md.App. at 272, 40 A.3d at 673 (D. Eyler, J.).

**76.** These Respondents' testimony extended to the marketability of neighbors' homes, others homes close to the strike line, close to a remediation site, or those properties "completely surrounded . . . by positive results for gas."

**77.** These Respondents did not express an opinion as to the value of their homes, or made statements relevant to the issue, but not covered by the categories listed *infra.* This group included the following property owners: Acchione, Butler, Csicsek, DiGalbo, Dixon, Elkington, Greco, Kropfelder, Lindsay, Mahoney, McDevitt, Shimp, Shultz, Sipes, and Wittelsberger.

**78.** For example, one Respondent reported that she feared that she would be unable to sell her property because a neighbor failed to sell

value by some unspecified percentage; [79,80] (2) they believed that their properties were worthless; [81,82] or (3) that the owners were unwilling to sell for "moral" reasons. [83] While some

---

his home. Another Respondent testified that she and her family were "stunned" when their house was sold because they had not expected any offers.

79. This group of Respondents included the following households: Alban, Albert, Anderson/Curtiss, Bateman, Benney, Berlin, Bieber, Brady, Cadigan, Coffay, Colgan, Copeland, Davis, DePasquale, Dobb, Faber, Fox, Fritz, Gottschalk, Gregory, Hourihan, Howe, Kukucka, Martin, McLewee, Merski, Montone, Mucha, Nickel, Oberlin, Osmeyer, Pfeiffer, Quinn, Rosch, Rush, Tolle, Twardzik, Vacovsky, Vogler, and Wiedey/Wilkinson.

80. These owners testified that they believed their homes had diminished in value, but did not state by what amount. They did not maintain expressly that their homes had no value. For example, one Respondent testified that the value of his property had "gone down just a huge amount," but not to zero, as "someone would buy my house for $10." Other Respondents used terms like "greatly diminished" or "severely impacted" to describe their properties' value. Twelve property owners questioned his or her property's value, stating they would not sell or that no sane person would buy, without actually stating that the property was worthless. Their explanations ran a gamut: (1) no sane person would buy the property, (2) the person testifying would not buy it if they did not live there and were looking for a house, and (3) the person testifying would not sell it either because he or she did not want to move or, as a matter of conscience and good morals, would refuse to sell it to anyone.

81. Respondents who offered such testimony were the owners of the following properties: Babcock, Baig, Barone, Batton, Blair, Carroll, Cremen, DeBolt, DeDeo, De Kooman, Diedeman, Facinoli, Ford, Flora, Hannan, Heggie, Howe, Jenkins, Lanting, Lamos, Peters, Schech, Thompson, Tirocchi, and Tizard.

82. Owners of about twenty-five properties testified, either explicitly or implicitly, that their properties were "worthless," "had no value," or were "worth 'absolutely negative zero.'" Many Respondents stated that if given the chance they would not purchase their own homes, and thus could not imagine why anyone else would do so "whatever the amount of money." Even though one Respondent recognized that some of the leak-impacted properties had sold, he observed "there [are] a limited number of fools out there that will pay money for a property that is completely surrounded by ... positive test results for gas."

83. A significant number of Respondents testified they were unwilling to sell their properties for "moral" or "good conscience" reasons, such as

Respondents stated that their neighbors could not sell their properties after publicity about the leak, other Respondents testified that they had tried unsuccessfully to sell their homes. Almost all of the Respondents opined that the news coverage of the leak created a "stigma" on their neighborhood, with some Respondents reporting that there was "an absolute stigma about real estate in the area." [84]

The reasons provided by the Respondents for the diminution in value of their homes were: (1) the lack of or diminished safety and convenience due to actual contamination of their properties' wells and the potential risk for future contamination; (2) contamination-induced stigma associated with the neighborhood; and, (3) the inconvenient and unsightly remediation efforts.[85]

Respondents described what they believed were the post-leak value of their properties; however, their testimony was not probative to measure damages for a property's diminution in value. Rather, such damages in a claimed toxic contamination situation must be measured by the *market* value of property—a definite valuation produced by analysis of the property in relation to any impact produced by contamination. *See Albright*, 433 Md. at 420–21, 423, 71 A.3d at 101–02, 103.

---

one Respondent who testified that even if he and his wife could sell their home, they did not want "to put this problem, this burden on someone else." Another Respondent reported that she was "morally uncomfortable" with selling the house to a family with children. Ford, a Respondent who is a real estate agent, testified that he would tell his clients to "walk away" from purchasing a property like his own.

**84.** Another Respondent (not Ford), who was also a real estate agent, opined that there was a stigma associated with the Jacksonville area. Another Respondent asserted that potential buyers would not consider his property even if he decided to sell, while others testified that even though they desired to sell, they felt they could not do so because any sale price would be insufficient to pay their home mortgages. The Baig property had nineteen monitoring wells with remediation equipment pumping twenty-four hours a day. In closing argument, Respondents' counsel stated: "Who would buy this house? It is worthless...."

**85.** Respondents described the remediation as causing loud and constant noise, bright lights, and the ruin of yards due to digging and heavy machinery.

This valuation may generally be made reliably only by expert testimony. *Id.* at 420–21, 71 A.3d at 101–02.

A landowner who testifies as to the value of his or her property is "not opining as to market value but rather is opining as to the effect of the contamination of the landowner's property." *Ford,* 204 Md.App. at 151, 40 A.3d at 602 (J., Eyler, J., concurring and dissenting.). It is well established that expert testimony is not required "on matters of which the jurors would be aware by virtue of common knowledge." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs.,* 109 Md.App. 217, 257, 674 A.2d 106, 125–26 (1996) (citing *Babylon v. Scruton,* 215 Md. 299, 307, 138 A.2d 375, 379 (1958)). As we recognized in *Albright,* the effect of contamination on a property's value is ordinarily beyond common knowledge and therefore requires expert testimony. *See* 433 Md. at 420–21, 71 A.3d at 101–02; *see Ford,* 204 Md.App. at 151, 40 A.3d at 602 (J. Eyler, J., concurring and dissenting.); *Cunningham v. Masterwear Corp.,* 569 F.3d 673, 676 (7th Cir.2009) (concluding that, even though a property owner knew his property value at certain time periods, he could not offer a responsible opinion about the cause of a change in the value of his property; rather, the landowner needed evidence by a real estate agent or real estate appraiser to establish the contamination effect on his property's value); *Hous. Auth. v. Suydam Investors,* 355 N.J.Super. 530, 810 A.2d 1137, 1149–50 (Ct.App.Div.2002), *aff'd in part and rev'd in part on other grounds,* 177 N.J. 2, 826 A.2d 673 (2003) ("[T]he effect of environmental contamination upon a property's value must be determined on the basis of expert appraisal evidence.").[86]

---

**86.** *See also Player v. Motiva Enters., LLC,* 240 Fed.Appx. 513, 516–18, 522 (3d Cir.2007) (in a case involving contamination of plaintiff property owners' properties by hazardous substances, the Third Circuit concluded that a plaintiff property owner's testimony—that a potential buyer had reneged on his offer to buy her property after he learned about the contamination—was insufficient proof of a decrease in property value.).

Respondents' testimony indicated that they believed their properties had decreased in value, but did not offer substantive valuations. Instead, several Respondents asserted in a conclusory fashion that they could not sell their properties in good conscience, and they believed therefore that their properties had zero sale value. While lay testimony may be relevant to any possible loss of use and enjoyment suffered in conjunction with Respondents' property damage claims, it offered no probative value as to the diminution in value claims. None of the Respondents—even those who identified themselves as real estate agents—testified as offered-and-accepted experts, and none testified based on any relevant training or expertise to accredit their lay opinions. While almost all Respondents maintained that a stigma was associated with their properties because of the leak, there was no evidence that there such stigma was permanent, which would be relevant to their claims of nuisance and the level of substantial interference. *See Albright,* 433 Md. at 411–13, 71 A.3d at 96–97. Even Respondents' expert, as discussed above, testified that the properties retained some value after the leak. *See* Section V.B of this opinion.

No evidence in this record supports the jury's verdict that Respondents' properties became worthless in terms of market value as a result of the leak; however, there is evidence that the properties suffered diminution in value. The trial court erred, however, in not performing an individualized assessment of each verdict in ruling on the motion for new trial or remittitur. Therefore, we hold that the trial court's denial of Petitioner's motion for a new trial was legally incorrect. We reverse the judgments in favor of Respondents who received awards despite owning or residing on non-detect properties. We reverse the jury's verdicts as to the remaining property diminution damage judgments, and direct remand of those cases for a new trial in light of our opinion here and in *Albright.*

**JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. JUDGMENT FOR DIMINUTION IN VALUE IN**

FAVOR OF ANDREA GRECO AND VERONICA GRECO REVERSED. JUDGMENTS FOR DIMINUTION IN PROPERTY VALUE IN FAVOR OF GEORGE BADDERS, MINDY SHOEMAKER, ROBERT DENNEY BARNETT, LOUIS LINDSEY, THOMAS BENNEY, LISA BENNEY, DENNIS BERLIN, LINDA BERLIN, ROBERT BUTLER, MARGARET BUTLER, BARLETT COLGAN, PATRICIA COLGAN, CAROL COPELAND, BRIAN CORMIER, KAREN HEALEY, FRANK FULCO, KATHLEEN FULCO, CLAUDE GOLLIHUE, JANET GOLLIHUE, MARTIN GREENBLATT, ELIZABETH ROBERTSON, MILDRED HAHN, JEFFREY JENKINS, NICOLE RIPKEN, ELAINE LINDSAY, WALTER MERSKI, ANTHONY MONTONE, VALERIE MONTONE, LEON NICKEL, JR., TERESA NICKEL, MICHAEL OBERLIN, LINDA OBERLIN, AND JOYCE PERTEE REVERSED; JUDGMENTS FOR DIMINUTION IN PROPERTY VALUE AS TO ALL OTHER RESPONDENTS REVERSED AND REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENTS AND REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; JUDGMENTS FOR EMOTIONAL DISTRESS REVERSED; JUDGMENTS FOR MEDICAL MONITORING COSTS REVERSED. COSTS TO BE PAID PRO RATA BY RESPONDENTS.